263 So.2d 797 (1972)
In re APPORTIONMENT LAW Appearing As SENATE JOINT RESOLUTION NUMBER 1305, 1972 REGULAR SESSION, Constitutionality Vel Non of.
No. 42253.
Supreme Court of Florida.
May 12, 1972.
Opinion Clarified and Rehearings Denied May 26, 1972.
*799 Robert L. Shevin, Atty. Gen., Jerry E. Oxner, Asst. Atty. Gen., for petitioner.
Robert M. Ervin, Wilfred C. Varn, Joseph C. Jacobs and Thomas M. Ervin, Jr., of Ervin, Varn, Jacobs & Odom, Tallahassee, William D. Barrow, Crestview, Don Dansby, Perry, Ed Duffee, Jr., Tallahassee, and William H. Shields, of Pavese, Shields, Garner, Haverfield & Kluttz, Fort Myers, for objectors.
ADKINS, Justice.
In original proceeding we have for consideration the petition of the Attorney General seeking a declaratory judgment determining the validity of Joint Resolution No. 1305 apportioning the Legislature of the State of Florida. Fla. Const. 1968, art. III, § 16(c), F.S.A. Adversary interests have filed briefs presenting their views and the matter has been orally argued before the Court.
At the outset, we emphasize that legislative reapportionment is primarily a matter for legislative consideration and determination. *800 Judicial relief becomes appropriate only when a legislature fails to reapportion according to federal and state constitutional requisites. If these requisites are met, we must refrain, at this time, from injecting our personal views into the proposed reapportionment plan. Even though we may disagree with the legislative policy in certain areas, the fundamental doctrine of separation of powers and the constitutional provisions relating to reapportionment require that we act with judicial restraint so as not to usurp the primary responsibility for reapportionment, which rests with the Legislature.
Fla. Const., art. III, § 16, F.S.A., contains the following:
"(a) Senatorial and representative districts. The legislature at its regular session in the second year following each decennial census, by joint resolution, shall apportion the state in accordance with the constitution of the state and of the United States into not less than thirty nor more than forty consecutively numbered senatorial districts of either contiguous, overlapping or identical territory, and into not less than eighty nor more than one hundred twenty consecutively numbered representative districts of either contiguous, overlapping or identical territory. Should that session adjourn without adopting such joint resolution, the governor by proclamation shall reconvene the legislature within thirty days in special apportionment session which shall not exceed thirty consecutive days, during which no other business shall be transacted, and it shall be the mandatory duty of the legislature to adopt a joint resolution of apportionment.
"(b) Failure of legislature to apportion; judicial reapportionment. In the event a special apportionment session of the legislature finally adjourns without adopting a joint resolution of apportionment, the attorney general shall, within five days, petition the supreme court of the state to make such apportionment. No later than the sixtieth day after the filing of such petition, the supreme court shall file with the secretary of state an order making such apportionment.
"(c) Judicial review of apportionment. Within fifteen days after the passage of the joint resolution of apportionment, the attorney general shall petition the supreme court of the state for a declaratory judgment determining the validity of the apportionment. The supreme court, in accordance with its rules, shall permit adversary interests to present their views and, within thirty days from the filing of the petition, shall enter its judgment.
"(d) Effect of judgment in apportionment; extraordinary apportionment session. A judgment of the supreme court of the state determining the apportionment to be valid shall be binding upon all the citizens of the state. Should the supreme court determine that the apportionment made by the legislature is invalid, the governor by proclamation shall reconvene the legislature within five days thereafter in extraordinary apportionment session which shall not exceed fifteen days, during which the legislature shall adopt a joint resolution of apportionment conforming to the judgment of the supreme court." (Emphasis supplied).
Senate Joint Resolution No. 1305, apportioning the Florida legislature was passed at its regular session in the second year following the 1970 decennial census. The United States Department of Commerce, Bureau of Census, prepared a Master Enumeration District List Coordinate Tape (MEDList Tape) which was purchased by the Florida legislature. Information from the Bureau of Census was computerized and made available in written and map form to the legislators, in which the units of population were broken down into counties and divisions of counties called Census County Divisions (CCD's). Smaller units *801 of information were provided in the form of Enumerated Districts (ED's), Place Codes (PC's), Census Tracts (Tracts) and Block Groups (BG's). These units of information represent geographical boundaries as used in the Bureau of Census reports of the 1970 census. The geographical boundaries for these units of information, smaller than the county unit of information, generally followed boundaries which were recognizable on the ground. They did not necessarily respect precinct lines and are not identical with precinct lines except where they coincided by accident.
Because the districts represented by Resolution No. 1305 geographically follow the lines used by the census bureau, the present county precinct lines are often split. For this reason, it was impossible for the legislators to consider the number of inhabitants in each election precinct. This information could have been secured by the legislature, so as to avoid the confusion resulting from the splitting of precincts by district lines. It was not secured, and the delay in securing such information at this late date would only result in more confusion.
Under the present apportionment plan, it will be necessary, in some instances, to move a polling place or establish a new one. In other instances, it will be necessary to have each voter sign an affidavit as to his place of residence and to vote in a separate voting booth or to vote in a machine capable of locking in only the voter's respective candidates. Registration officials, at the present time, are making the necessary adjustments so that an election may be held in an orderly fashion. Although this may be confusing, there is no requirement that district lines follow precinct or county lines, for the constitutional mandate (Fla. Const., art. III, § 16(a), F.S.A.) is that the state be apportioned into "districts of either contiguous, overlapping or identical territory."
Joint Resolution No. 1305 apportions the state into 120 House Districts and 40 Senate Districts. Of the House Districts, 21 are single member, 10 are two member, 9 are three number, 20 are four member, 30 are five member, and 30 are six member. Of the Senate Districts, 5 are single member, 14 are two member, and 21 are three member.
The apportionment policy followed by the legislature in Resolution No. 1305 is stated as follows:
"In the adoption of the House of Representatives districts contained in this resolution and in its deliberations preceding such adoption and culminating therein, this legislature is following in good faith the following rational state policy of:
"(1) Recognizing the continuous and dynamic population growth in this state by establishing a House of Representatives of one hundred and twenty (120) members, and in doing so guaranteeing better access between the inhabitants of this state and their representatives.
"(2) Providing multi-member districts for densely populated counties to guarantee effective representation and operation of government at the state level.
"(3) Providing single-member districts for the rural counties which achieves the state policy of guaranteeing effective representation and operation of government at the state level.
"(4) Establishing the following formula to achieve the above objectives:
"Multi-member districts in densely populated counties of the state are based on the county's representational ratio, however no multi-member district exceeds six (6) representatives; single-member districts are based on the same policy and are provided in the counties not covered above.
"However, the Legislature's overriding consideration to this policy is its good *802 faith effort to achieve mathematical preciseness." (Senate Joint Resolution No. 1305, Section 2)
In Reynolds v. Sims, 377 U.S. 533, 567, 84 S.Ct. 1362, 1384, 12 L.Ed.2d 506, 530-531 (1964), the United States Supreme Court said:
"Population is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies."
The Constitutions of Florida and the United States require that one man's vote in a district be worth as much as another. Mathematical exactness is not an absolute requirement in state apportionment plans; however, deviations, when unavoidable, must be de minimis. Whether a deviation is de minimis must be determined on the facts of each case. The United States Supreme Court in Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967), invalidated a Florida plan of apportionment with maximum percentage deviations from 15.09% over representation to 10.56% under representation in the Senate and from 18.28% over representation to 15.27% under representation in the House of Representatives.
The plan of apportionment contained in Joint Resolution No. 1305 has maximum percentage deviations in the House of Representatives from 0.10% over representation to 0.20% under representation, or a total deviation of 0.30%. This plan of apportionment has maximum percentage deviations in the Senate from 0.53% over representation to 0.62% under representation, or a total deviation of 1.15%. The legislature based the apportionment upon the report of the Bureau of Census without regard to county line or precinct line. In using this procedure the legislature should have been able to divide the state into districts so that there would be no deviation whatsoever. However, it appears that the legislature has made a good faith effort to achieve mathematical preciseness in the districts and in this regard has complied with the requirements of both the Florida and United States Constitutions.
We now turn to a consideration of the use of variable multi-member districts in the apportionment plan. Many say the ideal or model plan, of course, would be single-member districts with no deviation in population so that each member of the legislature would be solely responsible to the voters in his individual district and the voters, in turn, could direct praise or criticism toward one individual who represents them in the legislature. If variable multi-member districts are permissible under the Florida and United States Constitutions, then the decision to use multi-member instead of single-member districts becomes a matter of legislative policy.
In Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965), the Court considered the apportionment plan for the State of Georgia. Fifty-four senatorial districts were created along existing county lines. Thirty-three of the senatorial districts were made up of from one to eight counties each and voters in these districts elected their senators by a district-wide vote. The remaining twenty-one senatorial districts were allotted in groups of from two to seven among the seven most populous counties, but voters in these districts did not elect a senator by a district-wide vote; instead they joined with the voters of the other districts of the county in electing all the county senators by a county-wide vote. A group of registered voters attacked the plan contending that the requirement of county-wide voting in the seven multi-district counties violated the equal protection clause of the Fourteenth Amendment. The District Court ruled with the voters and invalidated the plan saying:
"The statute causes a clear difference in the treatment accorded voters in each of the two classes of senatorial districts. It is the same law applied differently to different persons. The voters select *803 their own senator in one class of districts. In the other they do not. They must join with others in selecting a group of senators and their own choice of a senator may be nullified by what voters in other districts of the group desire. This difference is a discrimination as between voters in the two classes .... The statute here is nothing more than a classification of voters in senatorial districts on the basis of homesite, to the end that some are allowed to select their representatives while others are not. It is an invidious discrimination tested by any standard." 228 F. Supp. 259, 263.
In reversing this decision, the United States Supreme Court said:
"It is not contended that there is not `substantial equality of population' among the 54 senatorial districts. The equal protection argument is focused solely upon the question whether county-wide voting in the seven multi-district counties results in denying the residents therein a vote `approximately equal in weight to that of' voters resident in the single-member constituencies. Contrary to the District Court, we cannot say that it does. There is clearly no mathematical disparity. Fulton County, the State's largest constituency, has a population nearly seven times larger than that of a single-district constituency and for that reason elects seven senators. Every Fulton County voter, therefore, may vote for seven senators to represent his interests in the legislature. But the appellees assert that this scheme is defective because county-wide voting in multi-district counties could, as a matter of mathematics, result in the nullification of the unanimous choice of the voters of a district, thereby thrusting upon them a senator for whom no one in the district had voted. But this is only a highly hypothetical assertion that, in any event, ignores the practical realities of representation in a multi-member constituency. It is not accurate to treat a senator from a multi-district county as the representative of only that district within the county wherein he resides. The statute uses districts in multi-district counties merely as the basis of residence for candidates, not for voting or representation." 379 U.S. 436, 85 S.Ct. 500, 13 L.Ed.2d 404.
"If the weight of the vote of any voter in a Fulton County district, when he votes for seven senators to represent him in the Georgia Senate, is not the exact equivalent of that of a resident of a single-member constituency, we cannot say that his vote is not `approximately equal in weight to that of any other citizen in the State.'
"In reversing the District Court we should emphasize that the equal-protection claim below was based upon an alleged infirmity that attaches to the statute on its face. Agreeing with appellees' contention that the multi-member constituency feature of the Georgia scheme was per se bad, the District Court entered the decree on summary judgment. We treat the question as presented in that context, and our opinion is not to be understood to say that in all instances or under all circumstances such a system as Georgia has will comport with the dictates of the Equal Protection Clause. It might well be that, designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population. When this is demonstrated it will be time enough to consider whether the system still passes constitutional muster. This question, however, is not presented by the record before us." (Emphasis supplied.) 379 U.S. 438, 85 S.Ct. 501, 13 L.Ed.2d 405.
In the present proceedings, we are confronted with a similar problem. We are passing upon the validity of Senate Joint Resolution No. 1305 on its face and our opinion should not be understood to say *804 that in all instances or under all circumstances a system of variable multi-member districts will comport with the dictates of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution or Article I (Declaration of Rights), Section 2 of the Florida Constitution.
In Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966), the Court, considering a variable multi-member district plan in Hawaii, said:
"But the Equal Protection Clause does not require that at least one house of a bicameral state legislature consist of single-member legislative districts. See Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401. Where the requirements of Reynolds v. Sims are met, apportionment schemes including multi-member districts will constitute an invidious discrimination only if it can be shown that `designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population.' Id., at 439, 85 S.Ct. at 501 [13 L.Ed.2d at 405].
"It may be that this invidious effect can more easily be shown if, in contrast to the facts in Fortson, districts are large in relation to the total number of legislators, if districts are not appropriately subdistricted to assure distribution of legislators that are resident over the entire district, or if such districts characterize both houses of a bicameral legislature rather than one. But the demonstration that a particular multi-member scheme effects an invidious result must appear from evidence in the record. Cf. McGowan v. State of Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393. That demonstration was not made here." (Emphasis supplied.) (384 U.S. p. 88, 86 S.Ct. p. 1294, 16 L.Ed.2d pp. 388-389)
Kilgarlin v. Hill, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967), involved an apportionment plan of Texas which contained a combination of single member, multi-member, and floterial districts. A floterial district is one formed by combining two or more districts, each of which elects its own representatives into a larger (floterial) district for the election at large of one additional representative. Although the apportionment was held invalid because of a population deviation, the Supreme Court affirmed the District Court's judgment insofar as it held that the protesters had not proved allegations (1) that it amounted to political gerrymandering so as to violate the Fourteenth Amendment, (2) that it unconstitutionally deprived Negroes of their franchise, and (3) that because of its utilization of single-member, multi-member and floterial districts it was an unconstitutional "crazy quilt." In other words, the plan containing single-member, multi-member and floterial districts was not, per se, unconstitutional in the absence of evidence in the record.
The latest case involving multi-member districts in an apportionment plan is Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). The Indiana plan provided for a House of Representatives of 100 members and a Senate of 50 members. Eight of the 31 Senatorial districts and 25 of the 39 House districts were multi-member districts represented by two or more legislators elected at large by the voters of the district. Residents of Marion County attacked the plan because their votes and the votes of those similarly situated, living in the ghetto area, would be diluted so that they would have less political force or control over their legislators because the effect of their vote is canceled out by other contrary interest groups in Marion County. With a single-member district, the ghetto area would elect three members of the House and one Senator.
A Negro resident of Lake County, also a multi-member district but a smaller one, alleged an invidious discrimination against *805 Lake County Negroes because Marion County Negroes, although no greater in number than Lake County Negroes, had the opportunity to influence the election of more legislators than the Lake County Negroes. It was claimed that Marion County was one-third larger in population and thus had approximately one-third more assembly seats than Lake County, and that permitting Marion County voters to elect 23 assemblymen-at-large gave them a disproportionate advantage over voters in Lake County.
The validity of the multi-member districts as such was upheld in that "such a district is not per se illegal under the Equal Protection Clause." The opinion of the Court, delivered by Mr. Justice White and concurred in by the Chief Justice, Mr. Justice Black, and Mr. Justice Blackmun, contained the following:
"The question of the constitutional validity of multi-member districts has been pressed in this Court since the first of the modern reapportionment cases. These questions have focused not on population-based apportionment but on the quality of representation afforded by the multi-member district as compared with single-member districts." (403 U.S. p. 142, 91 S.Ct. p. 1868, 29 L.Ed.2d p. 375)
"That voters in multi-member districts vote for and are represented by more legislators than voters in single-member districts has so far not demonstrated an invidious discrimination against the latter. But we have deemed the validity of multi-member district systems justiciable, recognizing also that they may be subject to challenge where the circumstances of a particular case may `operate to minimize or cancel out the voting strength of racial or political elements of the voting population.' Fortson, 379 U.S., at 439, 85 S.Ct., at 501 [13 L.Ed.2d at 405], and Burns, 384 U.S., at 88, 86 S.Ct., at 1294 [16 L.Ed.2d at 388]. Such a tendency, we have said, is enhanced when the district is large and elects a substantial proportion of the seats in either house of a bicameral legislature, if it is multi-membered for both houses of the legislature or if it lacks provision for at-large candidates running from particular geographical subdistricts, as in Fortson. Burns, 384 U.S., at 88, 86 S.Ct., at 1294 [16 L.Ed.2d at 388]. But we have insisted that the challenger carry the burden of proving that multi-member districts unconstitutionally operate to dilute or cancel the voting strength of racial or political elements. We have not yet sustained such an attack." (Emphasis supplied.) (403 U.S. p. 142, 91 S.Ct. p. 1868, 29 L.Ed.2d p. 376)
Mr. Justice Stewart joined in this part of the opinion. In his dissenting opinion, Mr. Justice Douglas, with whom Mr. Justice Brennan and Mr. Justice Marshall concurred, agreed that "multi-member districts are not per se unconstitutional," but held that the invidious effects of multi-member districts appeared from evidence in the record. It therefore appears that eight Justices of the United States Supreme Court agree that multi-member districts are not per se unconstitutional.
We will now consider the validity of variable multi-member districts under the provisions of the Florida Constitution. It is well settled that the state Constitution is not a grant of power but a limitation upon power. Unless legislation duly passed be clearly contrary to some express or implied prohibition contained in the Constitution, the courts have no authority to pronounce it invalid. Harry E. Prettyman, Inc. v. Florida Real Estate Commission, 92 Fla. 515, 109 So. 442 (1926); State ex rel. Jones v. Wiseheart, 245 So.2d 849 (Fla. 1971).
Mr. Justice Whitfield in City of Jacksonville v. Bowden, 67 Fla. 181, 64 So. 769 (1914) said:
"[N]o duly enacted statute should be judicially declared to be inoperative on the ground that it violates organic law, unless *806 it clearly appears beyond all reasonable doubt that, under any rational view that may be taken of the statute, it is in positive conflict with some identified or designated provision of constitutional law... . The courts have no veto power, and do not assume to regulate state policy; but they recognize and enforce the policy of the law as expressed in valid enactments, and decline to enforce statutes only when to do so would violate organic law." (Emphasis supplied.) (p. 772)
Hence, this Court, in accordance with the doctrine of separation of powers, will not seek to substitute its judgment for that of another coordinate branch of the government, but will only measure acts done with the yardstick of the Constitution. The propriety and wisdom of legislation are exclusively matters for legislative determination. As stated in 16 Am.Jur.2d, Constitutional Law, § 157, p. 365:
"Statutes are the creations of legislators; and since legislators are men, their creations are subject to the same critical analysis concerning wisdom, policy, fairness, justice, and expediency as other human acts. In directing attacks on laws assailed as unconstitutional, attempts are often made to stress these frailties as reasons why the courts should nullify the legislative pronouncement. These attacks uniformly fail."
Protesters refer to the Preamble of the Florida Constitution which guarantees equal "political rights to all," and say this right is denied by the apportionment plan. A preamble, of course, may not be invoked apart from specific provisions of the Constitution in order to invalidate a statute. 16 C.J.S. Constitutional Law § 23; District Landowners Trust v. Adams County, 104 Colo. 146, 89 P.2d 251 (1939). Even if this statement in the preamble be considered we cannot say that such a guarantee is any different than the guarantee afforded by the United States Constitution as discussed in the above authorities.
Fla. Const., art. III, § 1, F.S.A., provides as follows:
"Composition.  The legislative power of the state shall be vested in a legislature of the State of Florida, consisting of a senate composed of one senator elected from each senatorial district and a house of representatives composed of one member elected from each representative district."
Fla. Const., art. III, § 16, F.S.A., provides in pertinent part as follows:
"(a) Senatorial and representative districts. The legislature at its regular session in the second year following each decennial census, by joint resolution, shall apportion the state in accordance with the constitution of the state and of the United States into not less than thirty nor more than forty consecutively numbered senatorial districts of either contiguous, overlapping or identical territory, and into not less than eighty nor more than one hundred twenty consecutively numbered representative districts of either contiguous, overlapping or identical territory. Should that session adjourn without adopting such joint resolution, the governor by proclamation shall reconvene the legislature within thirty days in special apportionment session which shall not exceed thirty consecutive days, during which no other business shall be transacted, and it shall be the mandatory duty of the legislature to adopt a joint resolution of apportionment."
Construing these two sections together, the Constitution requires that there be one senator elected from each Senatorial district and one member of the House of Representatives elected from each representative district. This, standing alone, would require single-member districts. However, the Constitution further provides that districts may be "identical territory." This means that multi-members of the Senate or the House of Representatives may be elected from the identical territory if *807 such territory were designated as constituting several districts. To require single-member districts would void the provision of Fla. Const., art. III, § 16(a), F.S.A., authorizing the creation of districts in "identical territory."
We have examined a transcript of the proceedings before the Florida Constitutional Revision Commission on November 29, 1966, pages 381 et seq., where a motion was made to strike the language "either contiguous, overlapping or identical territory" and substitute therefor the language "which shall be neither overlapping nor contain identical territory." It was explained that the purpose of the amendment was to require single-member districts. During the debate, the arguments made in favor of the amendment were the same as those now made by the protestants. The proposed amendment failed.
Under the provisions of Fla. Const., art. III, §§ 1 and 16, F.S.A., multi-member districts are permissible and such multi-member districts may coexist with single-member districts in the same plan.
Protesters say the classification of single-member and multi-member districts is not a reasonable one. It is true that any attempted classification by the legislature must rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed and can never be made arbitrarily and without any such basis. Fronton, Inc. v. Florida State Racing Commission, 82 So.2d 520, 523 (Fla. 1955); State ex rel. Vars v. Knott, 135 Fla. 206, 184 So. 752, 754 (1938). Section 2 of Senate Joint Resolution No. 1305, quoted above, sets out the reasons for the classification. Single-member districts are provided for rural counties and multi-member districts are provided in densely populated counties based on the counties' representational ratio. However, no multi-member district exceeds six representatives. This classification rests upon a difference which bears a reasonable and just relation to the apportionment resolution and it does not appear to have been made arbitrarily. This Court is not at liberty to declare the apportionment plan void because it allegedly creates inconvenience, is unfair, or is inequitable, in the absence of a violation of some provision of the Constitution.
Fla. Const., art. I, Declaration of Rights, § 5, F.S.A., gives the people the right "to instruct their representatives." There is nothing in the apportionment plan which denies the people this right. The Constitution does not require that one representative be available for instruction from any one individual. Rather, the Constitution contemplates that any person has a right to instruct any and all representatives, whether his own or not. This right is not limited by the apportionment plan as each person maintains this right to instruct, whether he has one or several representatives.
When the people of Florida adopted the Constitution of 1968 they reserved to themselves the right to instruct their representatives and, at the same time, authorized the election of these representatives in senatorial and representative districts which may be "either contiguous, overlapping or identical territory." Every word of the Florida Constitution should be given its intended meaning and effect. In construing constitutions, that construction is favored which gives effect to every clause and every part of it. A construction which would leave without effect any part of the language used should be rejected if an interpretation can be found which gives it effect. 4 F.L.P., Constitutional Law, § 18, and authorities cited.
There are no provisions in the Florida Constitution relating to apportionment of the legislature more stringent than those of the United States Constitution. To say that the present apportionment meets the requirements of the United States Constitution, but is invalid under the State Constitution, is tantamount to imposing *808 our will upon legislative policy by limiting the clear provisions of our Constitution.
We, therefore, hold that variable multi-member districts are not per se invalid under the Florida Constitution. It might well be that, designedly or otherwise, a multi-member constituency scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population. When this is demonstrated, we will consider whether the apportionment plan still passes constitutional muster.
In other words, the apportionment plan as framed may be constitutional on its face, but upon its application in a particular case the joint resolution may violate organic law. This is in accord with our holdings that a statute may be valid as applied to one state of facts, though invalid as applied to another state of facts. See 4 F.L.P., Constitutional Law, § 10, p. 253, and authorities cited.
For example, in Hialeah Race Course, Inc. v. Gulfstream Park Racing Association, Inc., 37 So.2d 692 (Fla. 1948), we held that a statute was not unconstitutional per se, but in Hialeah Race Course, Inc. v. Gulfstream Park Racing Association, Inc., 245 So.2d 625 (Fla. 1971), upon consideration of a different factual situation, we held that the same statute denied equal protection and due process of law to one of the parties. Also, in Georgia Southern and Florida Railway Co. v. Seven-Up Bottling Company of Southeast Georgia, 175 So.2d 39 (Fla. 1965), we held that a statute imposing the doctrine of comparative negligence in suits against railroad companies was valid when enacted, but became invalid by changes in the conditions to which it applied.
The other grounds of protesters' attacks on the validity of the apportionment plan are based upon factual situations. For a proper determination of these contentions, it would be necessary for testimony to be taken and additional evidence presented. We have considered the appointment of commissioners for this purpose, but such a course is impractical under Fla. Const., art. III, § 16(c), F.S.A., mandating us to enter a judgment within thirty days from the filing of the petition by the Attorney General.
Furthermore, an impending election is imminent and the state's election machinery is already in progress. The proximity of the election should be, and is, considered by this Court, as well as the mechanics and complexities of an election under the apportionment plan contained in Joint Resolution No. 1305. This opinion should serve as a caveat to prospective candidates in that we are only determining the validity of the apportionment plan on its face.
The Florida Constitution contemplates that our judgment in these proceedings be limited to a declaration that the apportionment plan on its face is either valid or invalid under the Constitution of the United States and the Constitution of the State of Florida. We hold that it is valid on its face. This is without prejudice to the right of protesters to question the validity of the plan in appropriate proceedings raising factual questions asserted in their briefs.
We summarize as follows:
1. Apportionment is primarily a matter for legislative consideration and, in these proceedings, we cannot consider the wisdom, policy or fairness of Joint Resolution No. 1305 unless it violates some constitutional provision of the Federal or State Constitution.
2. The Florida Constitution requires that we determine whether the apportionment plan on its face is in accord with the Constitutions of Florida and of the United States.
3. The apportionment plan reaches mathematical preciseness with only de minimis *809 deviation. The fact that the legislature did not consider the plan according to political subdivision lines does not, in itself, invalidate the apportionment plan. See Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, 538 (1964).
4. The variable multi-member districts prescribed in the apportionment plan are not per se invalid under the United States Constitution or the Florida Constitution. We recognize that variable multi-member districts may be subject to challenge where the circumstances of a particular case may operate to minimize or cancel out the voting strength of racial or political elements of the voting population. This decision does not bar any such challenge based upon factual considerations in appropriate proceedings.
5. The forthcoming election may proceed, but any candidate should take notice that a challenger of the apportionment plan may be able to carry the burden of proving that these multi-member districts unconstitutionally operate to dilute or cancel the voting strength of racial or political elements. If such burden is met, the apportionment plan would be held invalid as to any area or district to the extent proved.
We now hold that Senate Joint Resolution No. 1305, on its face, sets forth an apportionment plan in accordance with the Constitutions of Florida and of the United States.
It is so ordered.
ROBERTS, C.J., and BOYD and DEKLE, JJ., concur.
CARLTON, J., dissents with opinion.
McCAIN, J., dissents with opinion.
SPECTOR, District Court Judge, dissents with opinion.
CARLTON, Justice (dissenting):
I am unable to join with my colleagues in the majority. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and subsequent United States Supreme Court reapportionment cases recognize population to be the controlling factor, but not the exclusive factor. Local government administration may also be taken into account, so long as numerical deficiencies involved are minimal. Local governments in Florida are recognized by Article VIII, Florida Constitution, as a rational means of providing for the common good and common welfare at the local level.
These political subdivisions are obviously not entitled to representation in the Legislature, but the Legislature nonetheless deals with these entities as a practical way of reaching the needs of the body politic. It is for this reason that Article III, § 16(a), Florida Constitution, requires districts to be "contiguous, overlapping or identical territory." Since citizens are governed largely on the basis of political subdivisions, they should not be forced to share representatives with portions of competing subdivisions where this can be avoided.
In regard to the House and Senate plans submitted to this Court, I agree with Chief Judge Spector that they are defective because they unnecessarily ignore county lines in numerous instances where these lines could be kept relatively intact while still adhering to Reynolds. The holding of the majority today that there is no requirement that district lines follow county lines because this is not specifically mentioned in Article III, § 16(a), Florida Constitution, overlooks the fact that the Constitution also provides for governance by subdivisions. When the Legislature chooses to determine its population districts without regard to this substantial interest, it arbitrarily discriminates between those citizens living in subdivisions kept intact and those in subdivisions which are fragmented. This *810 clearly violates the mandate of Article I, § 2, Florida Constitution, that all natural persons are equal before the law; for while those in unnecessarily fragmented districts may be equal in terms of numerical representation, they are unequal in terms of effective representation.
I also part from the majority of my colleagues on the issue of multi-member districting as presented before this Court. Article III, § 16(a) mandates that apportionment shall be carried out in accordance with the Constitution of Florida as well as that of the United States. In Reynolds, the Supreme Court said that apportionment provisions of state constitutions should be accommodated as much as possible, except when in violation of the United States Constitution, and particularly its Equal Protection Clause; see also, Burns v. Richardson, 384 U.S. 73 at 84-85, 86 S.Ct. 1286, 16 L.Ed.2d 376. Thus, both the Florida Constitution and the case law of the United States Supreme Court recognize that state constitutional standards are operative. There is no bar here to a state standard being applied more stringently than the federal constitutional standards so long as the Equal Protection Clause is not violated.
Only recently in State of Florida v. Barquet, Fla., 262 So.2d 431, we said regarding statutes: "Although similar statutes may be held valid by the United States Supreme Court, it does not necessarily follow that they are valid under the state constitution." This was followed by copious quotations on the point from 20 Am.Jur.2d, Courts § 225, pp. 556-557, and 21 C.J.S. Courts § 205, pp. 362-364. We also held that our Due Process Clause (Article I, § 9, Florida Constitution) could be read more stringently than the federal Due Process Clause. This being so, I am surprised by the majority's insistence that we cannot go beyond federal case law, especially since the Supreme Court has taken the position that this is principally a State issue.
To my mind, the mandate of Article I, § 2, Florida Constitution, is necessarily operative here as a safeguard against invidious discrimination: "All natural persons are equal before the law... ." In several of its multi-member district reapportionment cases, the Supreme Court has indicated that the absence of sub-districting in these districts would be of significance in determining the constitutional validity of the plans; Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); Burns v. Richardson, supra; Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). The purpose of sub-districting is to assure an equal distribution of at-large legislators that are resident over the entire district.
While the Supreme Court would make this one of several factors in evaluating a plan, I view it as a primary requirement imposed by Article I, § 2, Florida Constitution. Multi-member districts present a substantial potential for discrimination against minority groupings of all kinds sufficient to warrant a requirement that multi-member district candidates run from geographical subdivisions, albeit as at-large candidates. In the alternative, multi-member districts should be sustained only if the State is divided into entirely uniform multi-member districts with an equal number of representatives in all districts. I do not share the view of Chief Judge Spector that our Constitution's equal protection language requires single-member districts; Article III, § 16(a), Florida Constitution, controls this issue by providing that districts may be composed of identical territory.
The last issue involves the nature of this proceeding. Article III, § 16(c), Florida Constitution, provides that we are to review the joint resolution of apportionment on a petition for declaratory judgment. Fla. Stat. § 86.101, F.S.A. states that such judgments are instituted to, "[A]fford relief from insecurity and uncertainty with respect to rights, status and other equitable or legal relations... ." The action of *811 the majority today does not "afford relief from insecurity and uncertainty"; instead it appears to intensify these factors by holding that the apportionment plans are valid only per se. In view of the infirmities treated above, and in view of the fact that even the majority would have considered appointment of a Commissioner for the taking of evidence had time not been short, the proper course would be to rule negatively on the joint resolution so that proper reconsideration could be given to the issues by all concerned. This is not a matter which should be left circumstanced with doubt until the next decennial census is given effect.
However, since this situation cannot be avoided due to the majority's holding today, aggrieved citizens would do well to remember that this is essentially a declaratory judgment proceeding; therefore, the provisions of Fla. Stat. § 86.061, relating to supplemental relief, should apply. Article III, § 16(c)'s pronouncement that our judgment in this proceeding "shall be binding upon all citizens of the State" is merely a nullification of Fla. Stat. § 86.091, relating to parties, which holds that no declaration shall prejudice the rights of persons not parties to the proceedings.
For the reasons discussed, I would find the joint resolution unacceptable as an apportionment plan under the Florida Constitution.
SPECTOR, District Court Judge, concurs in part.
McCAIN, Justice (dissenting):
I must respectfully dissent from the majority.
While highest commendation is to be afforded our State Legislature for the tremendous task of arriving at an almost perfect numerical formula for apportioning our State House and Senate, nevertheless, computer results should not be substituted for the rights of the individual citizen to have fair and equal representation.
Even though our present review is a vel non consideration of the apportionment plan, ample evidence shows that degree of prejudice in and within certain districts to justify this Court in finding the plan unacceptable.
In my considered conclusion Senate Joint Resolution 1305 should be held invalid.
SPECTOR, District Court Judge (dissenting).
For the reasons hereafter discussed, I must respectfully dissent from the majority decision.
By his petition in support of the resolution, the Attorney General suggests that the only justiciable issues which are cognizable in this proceeding are:
1. Does the resolution apportion the legislature of the State of Florida on the basis of one man, one vote and in accordance with the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution?
2. Are the representative and senatorial districts provided for in said resolution contiguous, overlapping or identical as required by the Constitution of the State of Florida, Article III, Section 16?
Those interested persons who have appeared in opposition to the apportionment scheme adopted by the legislature seem to be in general agreement with the issues to be considered as delineated by the Attorney General. However, the adversary petitioners consisting of a group of thirty members of the legislature submit a third issue as being justiciable in this proceeding, which issue is framed as follows:
"The apportionment set forth in Senate Joint Resolution 1305, 1972 Regular Session, denies to the citizens of the State of Florida the constitutional guarantees *812 set forth in Article I, Sections 2 and 5, and Article III, Section 16, of the Constitution of the State of Florida."
In essence, the legislative group's petition rejects the Attorney General's hypothesis that the validity of the apportionment resolution is to be measured solely against federal constitutional standards. Their contention in this regard is well taken for the provisions of the state constitution relating to legislative apportionment, Article III, Section 16(a) itself states that the legislature "... shall apportion the state in accordance with the constitution of the state and of the United States... ."
I would hold therefore that state constitutional standards are equally compelling in determining the validity of a state legislative apportionment plan so long as adherence to such state standards does not collide with provisions of the federal constitution.
The legislative group's petition states that in determining whether state constitutional standards are met by the apportionment resolution, the court must take cognizance of the following provisions of the 1968 State Constitution, beginning with the preamble:
"We, the people of the State of Florida, being grateful to Almighty God for our constitutional liberty, in order to secure its benefits, perfect our government, insure domestic tranquility, maintain public order, and guarantee equal civil and political rights to all, do ordain and establish this constitution." (Emphasis supplied.)
* * * * * *
"Article I, Declaration of Rights. 
Section 1. Political Power.  All political power is inherent in the people... .
Section 2. Basic rights.  All natural persons are equal before the law... ."
* * * * * *
"Section 5. Right to assemble.  The people shall have the right ... to instruct their representatives, and to petition for redress of grievances." (Emphasis supplied.)
In pointing to the interests explicitly intended to be protected by the Florida Constitution which are not found in the federal constitution, it is contended that the validity of the Florida legislative apportionment plan is not to be determined solely by the principles established by the United States Supreme Court's decisions in the modern reapportionment cases starting with Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, and continuing through the past decade to Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363. Those federal decisions turn on that court's interpretation of the equal protection provision of the Fourteenth Amendment of the United States Constitution and do not necessarily address themselves to state constitutional standards which may be even broader than the federal equal protection clause. It seems to me that this contention is not without merit. That the framers of our state constitution intended the legislature to take cognizance of state constitutional provisions is manifested by the explicit mention of both state and federal constitutions in Article III, Section 16(a), which mandates adherence to the organic law of both sovereigns.
It is apodictic that the federal supremacy clause requires state constitutional provisions to give way to those of the federal constitution with which they collide. But if a state provision can be adhered to in formulating a state legislative apportionment plan without contravening a federal provision, then the state constitution compels such adherence.
The organic rights pertinent here which are expressly protected by the state constitution which have no counterparts in the federal compact find their genesis in that portion of the preamble which states the purpose of guaranteeing not only equal civil rights but also equal political rights. That a preamble may be resorted to in aid *813 of statutory construction to ascertain intent see 82 C.J.S. Statutes § 349, and this court's decision in State ex rel. Ervin v. Cotney, 104 So.2d 346. No mention of political rights is made in the preamble to the federal constitution. Political rights consist in the power to participate, directly or indirectly, in the establishment or management of the government. Every citizen has the right of voting for public officers and of being elected. These are the political rights which the humblest citizen possesses. 2 Bouv.Law Dict.
Article I, Section 1, Florida Constitution, declares all political power is inherent in the people. "Political power" as used in a state constitution declaring it to be inherent in the people has been held to consist of the three great attributes of sovereignty, namely, legislative, executive and judicial authority. Stewart v. Polk County Sup'rs, 30 Iowa, 9, 18, 1 Am.Rep. 328.
Article I, Section 5, Florida Constitution, declares that the people shall have the right to instruct their representatives and petition for redress of grievances. The corresponding provision of the federal constitution, Amendment I, is confined to the right to petition the government for redress of grievances and does not extend to the guarantee of the right of the people to instruct their representatives as does our state constitution.
I advert to the above distinctions between the state and federal constitutions to demonstrate the correctness of the legislative group's contention that the validity of the apportionment plan before us is not necessarily controlled by the federal decisions which are based on the equal protection clause of the Fourteenth Amendment. To be sure, we must accord primacy to those decisions, but not ultimacy.
The complaint of the legislative group, as well as other opponents of the plan, as they relate to the state-federal constitutional distinctions discussed above is twofold. First, it is contended that the political power and rights of residents of single-member legislative districts is diluted as compared to the political power and rights of the residents of multi-member legislative districts. Second, as an alternative thrust in event the first contention is rejected, it is submitted that if the multi-member legislative district is permissible under the state constitution, then the absence of uniform multi-member districts serves to clothe the residents of legislative districts with varying numbers of senators or representatives with varying and thus unequal degrees of political power and political rights.
Senate Joint Resolution 1305 provides for the establishment of a Senate to consist of forty members. Five are elected from single-member districts, fourteen from two-member districts, and twenty-one from three-member districts. The resolution further provides for a House of Representatives consisting of one hundred twenty members. Twenty-one are elected from single-member districts, ten from two-member districts, nine from three-member districts, twenty from four-member districts, thirty from five-member districts and thirty from six-member districts. In all, the Senate has five single-member districts, seven two-member districts, and seven three-member districts. The House has twenty-one single-member districts, five two-member districts, three districts with three members each, five four-member districts, six five-member districts and five six-member districts.
It is to be observed that each of the Senate and House districts are populated by an equal number of residents except in the many multi-member districts in which cases the population is equal to the number of legislators elected from that district times the mathematically "ideal" population figure supportive of each legislator. In this respect, the Florida Legislature has followed the dictates of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, which requires both houses of a state legislature to be apportioned in accordance with the equal population principle earlier established by that court in Baker v. Carr, supra. *814 My examination of the population figures submitted to us reflects only fractional percentage variations, in many cases being no greater in actual number of residents than the numbers of births and deaths occurring within the several districts since the last decennial census was taken.
Indeed, if I were to find fault on this score, it would be that the legislature may well have unnecessarily sacrificed other legitimate state interests in its slavish attachment to the equal population principle. As one reviews the de minimis population variances of .01 percent or less among the several districts, one is compelled to wonder whether the confusion arising from separation of small groups of voters from their accustomed political surroundings by "slivering off" county areas to attain a mathematically precise population profile amounts to more of an invidious discrimination than would result if county boundaries were not so cavalierly ignored.
Whether the computer-provided "cure" is better for the body politic than the discrimination inherent in a population variance of one or two or even three percent among some of the districts remains yet to be determined. It is to be realized that some county boundaries must of necessity be ignored in fashioning a proper apportionment. But total disregard of county lines seems to be the rule rather than the exception in Senate Joint Resolution 1305.
Reverting now to the question of the validity of multi-member districts. We are not unmindful that the United States Supreme Court considered this question in Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (June 7, 1971). The Attorney General argues that the Whitcomb case is dispositive of the claim that multi-member districts in a state apportionment scheme are invidiously discriminatory irrespective of the equal population per legislator as among the several districts.
In rejecting the claim of invalidity, the Whitcomb court ruled that multi-member districts were not per se unconstitutional and said at 403 U.S. 142, 91 S.Ct. 1868, 29 L.Ed.2d 375:
"The question of the constitutional validity of multi-member districts has been pressed in this Court since the first of the modern reapportionment cases. These questions have focused not on population-based apportionment but on the quality of representation afforded by the multi-member district as compared with single-member districts. In Lucas v. Forty-Fourth General Assembly, of State of Colorado, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964), decided with Reynolds v. Sims, we noted certain undesirable features of the multi-member district but expressly withheld any intimation `that apportionment schemes which provide for the at-large election of a number of legislators from a county, or any political subdivision, are constitutionally defective.' 377 U.S., at 731 n. 21, 84 S.Ct., at 1471 [12 L.Ed.2d at 644]. Subsequently, when the validity of the multi-member district, as such, was squarely presented, we held that such a district is not per se illegal under the Equal Protection Clause. Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965); Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); Kilgarlin v. Hill, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967). See also Burnette v. Davis, 382 U.S. 42, 86 S.Ct. 181, 15 L.Ed.2d 35 (1965); Harrison v. Schaefer, 383 U.S. 269, 86 S.Ct. 929, 15 L.Ed.2d 750 (1966). That voters in multi-member districts vote for and are represented by more legislators than voters in single-member districts has so far not demonstrated an invidious discrimination against the latter. But we have deemed the validity of multi-member district systems justiciable, recognizing also that they may be subject to challenge where the circumstances of a particular case may `operate *815 to minimize or cancel out the voting strength of racial or political elements of the voting population.'"
Speaking of circumstances which impermissibly effect the voting strength of protected elements of the voting population, the court continued to hold that:
"Such a tendency, we have said, is enhanced when the district is large and elects a substantial proportion of the seats in either house of a bicameral legislature, if it is multi-membered for both houses of the legislature or if it lacks provision for at-large candidates running from particular geographical subdistricts, as in Fortson [v. Dorsey]." 403 U.S. 143, 91 S.Ct. 1869, 29 L.Ed.2d 376.
Senate Joint Resolution 1305 is afflicted with at least two of the three impermissible failings of a multi-membered plan as condemned by the Whitcomb court itself  and this in the very case upon which the proponents of this plan rest so heavily. It can hardly be gainsaid that the instant plan fails to provide single-member districts for at least one house of the state legislature. Nor can it be denied that the plan presented to us lacks provision for at-large candidates running from particular geographical subdistricts. We cannot ignore the Supreme Court's recognition of the tendency to discriminate which is inherent in a multi-member plan such as we now have before us anymore than we can ignore its teachings in Baker v. Carr or Reynolds v. Sims and their progeny.
The Supreme Court's recognition of the multi-member district evil in Whitcomb is not minimized by its reversal of the trial court's ruling that single-member districts were required for Marion County, Indiana. In Whitcomb, the court was confronted with the claim that residents of Marion County were discriminated against by a multi-member legislative district provided for them. Additionally, it considered the claim that the residents of Lake County, which adjoined Marion County were discriminated against as opposed to the residents of Marion County whose multi-member district had been assigned a greater number of legislators than had been assigned to Lake County which itself was a multi-member district. There, the court was confronted with the claim of local discrimination as it was alleged to exist in two counties. Here, we are concerned with an apportionment plan for the entire state.
In Whitcomb, the court's ruling was based in part on evidence tending to prove that racial representation in the Indiana legislature from Marion County was disproportionate to their numbers because they, in addition to being members of a racial minority, were also members of a partisan minority in the multi-member district. Thus, the court dismissed the contention that negroes were excluded by the diluting effect of the multi-member plan on their voting power because the evidence showed that the Republican Party candidates won four out of five legislative elections in Marion County and the negroes who resided in the ghetto voted heavily Democractic. The court stated, at p. 153 of 403 U.S., at p. 1874 of 91 S.Ct., at p. 381 of 29 L.Ed.2d:
"... the failure of the ghetto to have legislative seats in proportion to its population emerges more as a function of losing elections than of built-in bias against poor Negroes. The voting power of ghetto residents may have been `cancelled out' ... but this seems a mere euphemism for political defeat at the polls."
No evidence has been presented to us nor are there circumstances in the Florida political arena of which I am cognizant from which it can be concluded as did the Whitcomb court that the disproportionate number of negroes in the state legislature is due to their membership in the political party that loses most legislative elections. Indeed, the opposite seems true. Our statistics show (Fla.Abstract, 1967) that some 94% of negroes in Florida are registered as member of the Democratic Party and *816 that party has won a vast majority of the legislative elections in modern times. Accordingly, I don't think we can reach the same negative conclusion on the question of the tendency of a multi-member district plan to diminish the vote of racial minorities in Florida as the Supreme Court did in the Whitcomb case.
While I can distinguish the racial aspects of multi-member districts in Florida from those in Marion County, Indiana, and decline to conclude, as did the court in Whitcomb, that there is no constitutionally recognizable inequality which flows from resort to multi-member districting, I am quick to say that any tendency toward racial discrimination which may inhere in such multi-member districts is due to the nature of the multi-member district device and the natural statistical consequences which stem from its use rather than to any conscious effort of our state legislature or constitutional framers to bring about any racial discriminaion.
As indicated by the foregoing discussion, I do not feel that the Whitcomb decision is conclusive of further inquiry into the federal constitutional efficacy of multi-member districts. Moreover, we cannot ignore the impact of the Supreme Court's decision in Connor v. Johnson, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268, decided some three days before the Whitcomb decision. In Connor, the court summarily approved the decision of a three-judge U.S. District Court convened in Mississippi that invalidated that state's latest reapportionment statute on grounds of population disparities among districts. The lower court had deferred the effectiveness of its order requiring single-member districts drawn by the court until after the ensuing election. The Supreme Court on June 3, 1971, reversed the trial court's aforesaid order of May 14, 1971, saying, at page 692 of 402 U.S., at page 1762 of 91 S.Ct., at page 271 of 29 L.Ed.2d:
"The District Court's judgment was that single-member districts would be `ideal' for Hinds County. We agree that when district courts are forced to fashion apportionment plans, single-member districts are preferable to large multi-member districts as a general matter."
There is yet another reason why the Whitcomb decision is not dispositive of the issues raised by the opponents. Article I, Section 5 of the Florida Constitution, in addition to preserving the right to petition for redress of grievances, also provides that "the people shall have the right ... to instruct their representatives." The right to instruct one's representative is but a restatement of the right to effective representation. The two concepts are one and the same. Although the Whitcomb court considered the validity of the Marion County multi-member district in light of the equal protection clause of the Fourteenth Amendment and the evidence of discrimination adduced in that particular proceeding, there is no indication that the court considered the question of effective representation or its Florida constitutional counterpart, the right to instruct one's representative.
No less a prestigious observer of the United States Supreme Court than the Harvard Law Review brings this omission into focus as it reviews the Whitcomb decision in its review of the Supreme Court's cases decided in the 1970 Term found in Volume 85, No. 1, p. 140:
"Although the Whitcomb Court obviously had great sympathy for the claim of the ghetto plaintiff, the serious problems associated with recognizing effective representation as a constitutionally protected right led it to deny relief." (Emphasis supplied.)
That the United States Supreme Court encountered serious problems in recognizing effective representation as a constitutionally protected federal right should not deter this court from doing so since that right is protected under the state Constitution.
*817 The right of effective representation though expressly protected to its citizens by the Florida Constitution was not ruled upon as it is effected by multi-member districts in the Whitcomb case. The exercise of this right is significantly impaired by use of multi-member districts. Communications between legislators and their constituents is made very difficult by such districts. Voters who must select from a large number of candidates cannot vote intelligently due to a confusion of issues and personalities. It is certainly easier to judge the qualifications of a limited number of candidates for a single office than of a mass of candidates for several offices. The lack of accountability impairs the ability of a citizen to receive effective representation. Thus, resort to multi-member districts inevitably impinges on rights expressly reserved to all in the state Constitution.
In Lucas v. Forty-Fourth General Assembly of Colorado, 377 U.S. 713, 731, 84 S.Ct. 1459, 1471, 12 L.Ed.2d 632, 644, the Supreme Court considered the attributes of multi-member districts as they relate to the right of an individual to instruct his representative and to obtain effective representation and said:
"No identifiable constituencies within the populous counties resulted, and the residents of those areas had no single member of the Senate or House elected specifically to represent them. Rather, each legislator elected from a multi-member county represented the county as a whole."
Multi-member districts inherently pose the following problems which render their use questionable:
1. Organizations and alliances can exercise more influence in legislative matters than in a single member district.
2. Multi-member districting has the effect of discriminating against rural areas included in multi-member districts with large urban centers. An urban candidate can virtually ignore the rural areas. Under a single-member plan, these areas could elect their own representatives.
3. Multi-member districts enhance the power of voters in such districts since they have several legislators to represent them.
4. Multi-member districts operate to dilute or cancel the voting strength of racial, economic and political minorities.
5. Communication between legislators and their constituents is made very difficult by multi-member districts. Voters who must select from 20 or 30 candidates for the House cannot vote intelligently due to a confusion of issues and personalities. It is much easier to judge the qualifications of a limited number of candidates for a single office than of a mass of candidates for several offices. The lack of accountability that results from multi-member districting seriously impairs responsible state government.
6. Large multi-member districts force extensive and expensive campaigning. Many qualified people are discouraged from running for office because of the cost.
In my view the plan of legislative apportionment prepared by the legislature cannot stand. While it is meticulous, perhaps to a fault, in its compliance with the arithmetical demands of the "one man, one vote" principle of the Fourteenth Amendment, it does not at the same time adequately preserve the individual rights of each citizen as required by the Article I, §§ 1 and 5, Florida Constitution of 1968, because it fails to provide for single-member legislative districts. It may well be that if the people of Florida are ever to be the beneficiaries of a single-member legislative district plan as recommended by the "Citizen's Conference on State Legislatures", it shall come only by the people's exercise of the power to propose amendments to Article III, § 16 of the Constitution by initiative pursuant to Article XI, § 3, Florida Constitution of 1968.
*818 It is recognized, as ably argued by the Attorney General, that Article III, § 16(a), authorizes legislative districts of "either contiguous, overlapping or identical territory". But it has long been the rule that constitutional provisions relating to legislative apportionment which infringe on constitutionally protected individual rights must give way to the latter. It is not without precedent that a court has held a constitutional provision to be without force when in conflict with rights guaranteed by another provision. The Supreme Court of New Jersey held in Jackman v. Bodine, 43 N.J. 453, 205 A.2d 713, that a state constitutional provision relating to legislative composition could not stand when faced with the federal equal protection clause. The Illinois Supreme Court held that a constitutional provision for staggering terms for senators was not mandatory and could be disregarded when the court was called upon to fashion a reapportionment plan. People ex rel. Engle v. Kerner, 33 Ill.2d 11, 210 N.E.2d 165. There are also numerous cases in which federal courts have held apportionment plans invalid even though made in accordance with state constitutional mandates. In Buckley v. Hoff, 234 F. Supp. 191, the District Court held a provision of the Vermont Constitution in contravention of the United States Constitution and therefore void, and in Bannister v. Davis, 263 F. Supp. 202, the court stated that any provision of Louisiana Constitution conflicting with the Federal Constitution must fall.
While factors formulating rational state policies must give way to the dominant principle of equal population districting, mathematical exactitude does not preclude variations which do not interfere with the "one man, one vote" principles which have evolved in the apportionment decisions. Respecting the integrity of existing boundaries of political subdivisions of the state has long been recognized as a valid state policy which justifies minor deviations from ideal population figures. Maintaining a citizen's membership in a homogeneous governmental unit is a valid state goal. A citizen's concern with local units of governments and governmental affairs cannot be dismissed in a willy-nilly fashion. To separate a small segment of a county's population where population ratios do not require obviously has some purpose other than compliance with the "one man, one vote" principle.
There are at least three reasons why state legislatures should be permitted and even encouraged to base legislative districts on county and municipal boundaries.
The first is that the residents of counties and cities have certain common interests and needs, and their local governments must often seek the assistance of their state legislators in sponsoring and supporting legislation to deal with specific local problems. As the Supreme Court recognized in Reynolds v. Sims, supra, "In many States much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions." In addition, the legislature is increasingly called upon to regulate the relationships among local governments. It is important for legislators to represent the voters living in specific cities, counties and districts, and not just those residing in particular census tracts.
Further, the Reynolds court recognized that "local governmental entities are frequently charged with various responsibilities incident to the operation of state government." Especially important in that regard are local school boards.
Political boundaries represent lines of communications, and lines of responsibility and authority. When those lines are not recognized in the makeup of the legislature, it will become the natural order of things that the legislature and the system of positive law will be bypassed in, or will itself bypass, the governmental process.
A second reason for maintaining political boundaries in apportionment is less often *819 recognized. One reason that state legislatures appear to be ineffective and unresponsive is that citizens seem to know little about their activities and often do not know what their own legislators are doing, or even who they are. Sometimes the lack of acquaintance runs in the other direction as well. If legislators are elected from districts that are unrelated to familiar city and county boundaries, they are likely to be even less visible to the voters. The visibility of legislators is not a trivial problem, but is central to the functioning of a representative system.
A third reason for maintaining political boundaries was also recognized by Justice Warren in Reynolds v. Sims: "Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering." Justice White agreed in his dissent in Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969): "If county and municipal boundaries are to be ignored, a computer can produce countless plans for absolute population equality, one differing very little from another, but each having its own very different political ramifications... ." Justice White criticizes "quibbling disputes over such questions as whether a plan with a 1% variation is `better' than one with a [1.1%] variation".
One group of opponents to the plan presented argue most persuasively that Polk County[1] is an example of an unnecessary *820 diminution of the political power and rights of residents of small geographical slivers with no valid state purpose. It is suggested that the House representation of the people of Polk County is an example of such problems in the plan. Most of the county is represented in a four-man district; but a southeast corner is thrown in with a second four-man district whose primary concern will be the people of urban Tampa; also a northwest corner is given to a single member who must also seek to represent another inland county, half of a coastal county and a sliver of a fourth county; finally, there is added to the Polk district a fragment of a sixth county. All of these machinations are imposed upon the people of a county who, if the county is left intact, astoundingly number within one-half of one percent of the exact aliquot share of the state population which should be represented by the original four members.
The right of the individual citizens residing in the small detached areas of Polk or any other county to elect or participate in the election of legislators who can reasonably be expected to be concerned with the many problems that center on the county as a unit is a right protected by the state constitutional provision guaranteeing to each citizen the right to instruct his representatives. That right is also one in the exercise of which each man stands equal before the law and thus is encompassed within the equal protection provisions of both the State and Federal Constitutions.
Although each citizen possesses the rights above enumerated, we must recognize that there is no constitutional principle more widely accepted than the rule that all rights are relative. The right to instruct one's representatives as well as the right to do so along with and in the same meaningful manner as does his neighbor, *821 while constitutionally protected, is a relative right which must be subservient to rights which are, in the circumstances of the particular case, dominant. The widely accepted rule as to the relativity of rights requires recognition of the concept that some constitutionally protected rights are dominant over other rights which though subservient to the former are nonetheless protected by the constitution.
In Baker v. Carr and the decisions which flow from that case, it was held that a state legislative apportionment scheme which enables one man's vote to have greater weight than another's in the elective process is an invidious discrimination and deprives the latter of equal protection of the laws. The court further held that any provision of a state constitution or statute must fall if the manner in which it operates or is applied does or tends to invoke an invidious discrimination against any citizen and is therefore a violation of the equal protection provision of the Federal Constitution. To lend vitality and meaning to this principle, the Supreme Court has held that a state's legislative apportionment plan must provide that each legislator must represent substantially the same number of residents and that any state constitutional or statutory provision must fall if it produces an impermissible discrimination. In the intervening decade since Baker, the courts of the nation, both state and federal, have not hesitated to strike down state constitutional provisions or statutes which discriminate against individuals in the elective process.
The right to elect one's representatives together with his neighbors on a uniform county governmental unit basis is part and parcel of the constitutionally protected right to instruct one's representatives. That right, of course, is subservient to the equal population principle of the apportionment cases and must give way to the one man, one vote rule where necessary to accomplish the one man, one vote principle. Where a state fashions its apportionment plan with blind adherence to the equal protection principle by unnecessarily crossing county lines to form a legislative district, the residents of the fragmented county portions are entitled to have weighed by the courts the relativity of the right to effective representation against the necessity of meeting the one man, one vote criteria within several hundredths of one percent population variations.
In my view, where a group of residents are fragmented from a county unit to achieve unnecessary mathematical exactitude in population districts, those residents have been deprived of their state and federal constitutional rights where the legislature could have complied with the equal population principle by providing districts with larger percentage variations of two or three percent magnitude in order to achieve the preservation of the right to vote within one's county unit, a state policy which has been held a valid ground for slight population variances.
Although, as noted earlier, the legislature surpassed itself in pursuit of ideal numbers of persons in each legislative district, the apportionment law fails quite badly in the pursuit of the larger goal of a political structure that can be responsive to the will of the people of Florida. "A computer may grind out district lines which can totally frustrate the popular will on an over-whelming number of critical issues," Justice Harlan warned in the Kirkpatrick case cited above. When a computer is told to draw a district by starting at a point and pulling in census tracts, block groups, blocks and houses until mathematical precision is reached, it will respond by choosing those units for no better reason than their contiguity.
One need only to observe the many instances in which counties were unnecessarily fragmented in the rigid quest for mathematical certainty to conclude that the legislature may have abdicated its legendary infinite wisdom to a computer.
I would hold Senate Joint Resolution 1305 invalid and require the legislature to *822 produce another apportionment plan which conforms to the judgment of this Court. Article III, § 16(d). In remanding this matter for further proceedings by the legislature, we cannot ignore the almost disabling uncertainty which confronted the legislature and other public officials in the immediate aftermath of Baker v. Carr and its progeny beginning with Sobel v. Adams, because of the absence of guidelines.
A similar hiatus should be avoided if possible. Accordingly, the following criteria should provide significant guidelines to the legislature in fashioning a valid apportionment plan.
1. Each house and senate district should be single-member.
2. Each district should consist of a compact and contiguous area.
3. Each district should be equally populated according to the latest available 1970 census figures.
4. Subservient to the basic principle of equality of population, the plan should respect the integrity of existing boundaries of political subdivisions of the state.
5. Minor deviations not to exceed 3% will be considered if they facilitate the maintenance of such boundaries or any other rational state policy.
6. In fashioning districts, no consideration may be given to the residence of incumbent legislators.
7. No consideration may be given to the voting patterns of the electors.
8. Each legislative district must consist of identifiable units from the corrected third count from the 1970 Federal Census.
9. The plan must divide the state into forty equally populated senatorial districts having a population norm of 169,773.
10. The plan should divide each senatorial district into three equally populated house districts, having a population norm of 56,591.
CARLTON, J., concurs in part and dissents in part with opinion.

ORDER CLARIFYING OPINION AND DENYING REHEARING
ADKINS, Justice.
As a matter of great public interest, we deem it expedient to outline the proceedings by which a challenge based upon factual considerations may be made under the apportionment plan.
Under Fla. Const., art. III, § 16 (c), F.S.A., we have rendered a "declaratory judgment" determining the validity of the apportionment plan on its face. By classifying the proceeding as one for "declaratory judgment," the Florida Constitution contemplates that we retain exclusive state jurisdiction and consider any and all future proceeding relating to the validity of the apportionment plan. In the event it becomes necessary to take testimony in order to determine the validity of any district within the apportionment plan, this Court may appoint a commissioner for this purpose.
The remedy for determining whether the circumstances of a particular case operate to minimize or cancel out the voting strength of racial or political elements of the voting population is by supplemental relief, authorized by the following provision of the Declaratory Judgment Law, Fla. Stat. § 86.061, F.S.A.:
"Further relief based on a declaratory judgment may be granted when necessary or proper. The application therefor shall be by motion to the court having jurisdiction to grant relief. If the application is sufficient, the court shall require any adverse party whose rights have been adjudicated by the declaratory judgment to show cause on reasonable notice, why further relief should not be granted forthwith."
*823 The real-life impact of the apportionment plan on individual voting power could not be demonstrated until after an election or series of elections. Whether or not it operates to minimize or cancel out the voting strength of racial or political elements of the voting population remains to be demonstrated in practice and in the day-to-day operation of the Legislature. Since the apportionment plan has achieved constitutional mathematical preciseness, the objections of the challengers could not be determined until consideration is given to the voting power of the voters expressed in an election, as well as the quality or effectiveness of representation later furnished by the successful candidates. See Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).
In our original opinion, we said:
"We, therefore, hold that variable multi-member districts are not per se invalid under the Florida Constitution. It might well be that, designedly or otherwise, a multi-member constituency scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population. When this is demonstrated, we will consider whether the apportionment plan still passes constitutional muster." (Emphasis supplied.)
The various petitions for rehearing are denied.
ROBERTS, C.J., and BOYD and DEKLE, JJ., concur.
CARLTON, J., dissents with Opinion.
McCAIN, J., dissents and agrees with CARLTON, J.
SPECTOR, District Court Judge, dissents with Opinion.
CARLTON, Justice (dissenting):
The Order clarifying the opinion and denying rehearing is consistent with the opinion of the majority in this case. However, I would grant rehearing because of the infirmities inherent in the original opinion as pointed out in my dissent thereto.
McCAIN, J., concurs.
SPECTOR, District Court Judge (dissenting):
I respectfully dissent from the majority decision to deny rehearing. I would grant rehearing and hold that Senate Joint Resolution 1305 fails to meet both state and federal constitutional standards for the reasons stated in the earlier dissenting opinions.
The contention of petitioners that the imminence of the coming elections for legislative seats should not deter this court in the performance of its constitutional duty to meet head-on the question of the validity of Senate Joint Resolution 1305 is well taken. The petitioners' suggestion that we can permit the impending elections to proceed under the legislative apportionment plan embodied in Senate Joint Resolution 1305, while requiring the new legislature elected thereunder to fashion a plan which is free of constitutionally debilitating defects, is fully consistent with the approval given by the United States Supreme Court to similar treatment of an impending election in Kilgarlin v. Hill, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967). In that case, the lower court had entered an order permitting immediately pending elections to be conducted under an apportionment it found defective in part, but directed corrective action immediately thereafter. The Supreme Court stated:
"We affirm the District Court's action in permitting the 1966 election to proceed under H.B. 195 although constitutionally infirm in certain respects..." Kilgarlin, supra, at p. 121, 87 S.Ct. at p. 821.
*824 By pursuing the Kilgarlin approach, we can avoid interfering with the coming election for legislative seats, and at the same time we can provide guidelines to the newly elected legislature to assist it in fashioning a constitutionally valid plan. Even though Senate Joint Resolution 1305 is "infirm in certain respects", it is nonetheless an improvement over the plan now in effect, thus enhancing the likelihood that the new legislature can agree on a constitutionally valid plan.
Deferring the effectiveness of a judgment requiring single-member districts until after the impending elections will enable the appropriate legislative committees (or in default thereof, this court) to obtain the necessary census figures from Washington to facilitate conversion of census tract information into precinct population figures. Thus, the disruptive practice of splitting voting precincts can be eliminated when it becomes necessary to divide counties to achieve necessary population equality between legislative districts.
Maintaining the integrity of precinct lines will tend to reduce voter confusion and thus increase voter participation in the elective process. There is no reason why the voter should be required to vote in one polling place for his legislative representatives and yet another for his legislative senators, not to mention other local officers.
Except for deferring until after the coming elections the requirement that the legislature adopt a valid plan, I adhere to the views expressed in my earlier dissenting opinion that Senate Joint Resolution 1305 is invalid. The plan provided therein is facially discriminatory by its irrational resort to varying multi-member districts when it is clear that a single-member district plan would manifestly provide equal quantitative and qualitative representation for all citizens whether rural or urban, democrat or republican, black or white.
Legislative reapportionment was the exclusive domain of the legislature prior to the adoption of the Constitution of 1968. The separation of powers doctrine does not inhibit this court's authority to declare an apportionment bad and then, failing curative action by the legislature, to proceed with a court-fashioned plan. The separation of powers article in the state Constitution, Article II, Section 3, explicitly provides that "No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein." (Emphasis supplied.) The new Constitution expressly provides that the court has the authority and, indeed, affirmative duty to fashion an apportionment plan if the legislature fails to enact one conforming to the judgment of the court. Thus, prior to the 1968 Constitution, the separation of powers doctrine clearly prevented judicial intrusion into what was heretofore the legislative domain. That power no longer lies within the exclusive jurisdiction of the legislature.
Accordingly, I am not persuaded that the separation of powers doctrine is a sufficient basis upon which we can decline to perform the duty mandated by the modern and responsive Constitution of 1968.
While I would grant rehearing and require the newly elected legislature to fashion a single-member plan, I do agree with the majority view expressed in Justice Adkins opinion on rehearing that the floodgates to litigation in the trial courts throughout the state should not be opened since the state Constitution clearly places the judicial responsibility respecting legislative apportionment in the Supreme Court.
NOTES
[1] Polk County is only one example of unnecessary county fragmentation. There are many others and we refer only to a few others in this footnote since the time and circumstances of this case do not permit the receipt and consideration of more specific evidence as it relates to the legislative districts throughout the state as was done in Whitcomb v. Chavis, supra; Bussie v. Governor of Louisiana (E.D.La.), 333 F. Supp. 452, and like cases.

Walton County  The computer placed all but the northeast portion of this county in Senate Districts 1 and 2, consisting of all of Escambia, Okaloosa and Santa Rosa Counties, plus all of Walton but the northeast portion. As drawn, the two-member district has a population of 340,182 against the ideal population of 339,546 for a percentage variance of only 0.18. The omitted portion of northeast Walton contains 7,167 population and was assigned to Senate multi-member Districts 2 and 3. If the computer had known that the maintenance of county lines was a valid state policy, cognizable by the reapportionment decisions, where to do so would produce only a slight percentage variance of several points, it, the computer, would have put all of Walton County into Senate Districts 1 and 2. The additional population thus gained would have resulted in a population variance of only 2.27 percent. Certainly, it cannot be argued that such a variance is invidiously discriminatory where it is the result of bona fide policy of preserving county lines and keeping Walton County intact for maximum legislative effectiveness for its residents. Such a variance lies well within the percentage variances approved by the courts.
Removing the northeast section of Walton County from Senate Districts 3 and 4 would alter the present (under Senate Joint Resolution 1305) population there of 340,326 by reducing it to 333,159 which is only 6,387 or 3.6% variance from ideal. This variance, while not impermissible, can be reduced simply by uniting Taylor County and placing it all in Districts 3 and 4. Presently, Taylor has 2,304 in Districts 3 and 4. But the southern half of Taylor is in Districts 5 and 6. If said southern half of Taylor is brought into 3 and 4, an additional 11,337 people will be brought into 3 and 4 altering the figure there from 6,387 under ideal to 4,950 over for a variance of only 2.82% over the ideally populated Senate District. Paradoxically, the minor adjustment to reunite Walton County facilitates the uniting of Taylor County.
Similar adjustments could have been made if the legislature hadn't been misled into thinking that precise arithmetical equality was both the alpha and the omega of legislative apportionment. Apropos the legislature's obvious misconception, I think it appropriate to recite the following language from League of Nebraska Municipalities v. Marsh, D.C., 253 F. Supp. 27 (1966), appearing at pp. 30, 31, viz:
"The law does not require that counties be massacred to achieve mathematical exactness. Where important interests of those even in remote corners of a county are identical, whether in trade, business, ethnic origin, or otherwise, with residents throughout the county, county lines are entitled to be respected within proper measure of discretion... ."
* * * * *
"We do not believe, however, that the shattering, scattering and mechanical joinder of precincts which would have to be engaged in to produce that attainable mathematical result is legally required, or that it would be meritoriously desirable in its local significances, or that it would be likely to be representationally satisfactory to the voters of the State. Some reasonable margin of variance beyond this can properly exist, we think, where it is apparent that there has been a good-faith attempt to have the redistricting provide as large and as nearly equal a quantum of individual voting power as possible, but at the same time not to have it constitute a purely mechanical result, which realistically would cut off representational opportunity and leave only abstract franchise privilege."
The few instances above mentioned are but examples of unnecessary division of counties which place the residents of the split county in an untenable position regarding their legislative representation.
Senate Districts 26, 27 and 28 present the discrimination inherent in large multi-member districts covering widespread geographic areas with widely diverse interests. Political differences, many of which are inextricably mingled with and have their source in the economic differences in the three man district. There is no rational justification to support the connecting of the "Indian River Citrus Belt" with overpowering Palm Beach County when the three counties constituting that area, Indian River, St. Lucie and Martin, having a total population of 114,863 could be combined into a homogeneous one man senatorial district which is compact, contiguous and ideally populated by merely adding to those three counties a small group of census tracts, T 1-4, T 6-13 all lying north of Lake Worth Inlet in Palm Beach County. The resulting population of such a district would be 169,124 or only 649 less than the ideal for a minus .42 per cent variation leaving the remainder of the proposed new two man district at only a .34 per cent variable from the ideal. This failure to provide a single member senatorial district is but another example of what results when a computer is permitted to do man's thinking.