HATCHETT, Justice,
dissenting.
The majority of the Court refuses to entertain the grievances of these petitioners regarding discrimination in representation in multi-member House District 109-114 because:
(1) The district “from its inception, [did not] discriminate[d] against petitioners by operating to minimize or cancel out their voting strength;”
(2) “[T]here is no allegation that the Senate Joint Resolution encompassed a deliberate attempt to discriminate racially against those of Hispanic origin;”
(3) “We did not intend to retain jurisdiction . . . [to] continuously monitor changing ethnic, racial or population patterns and require adjustments to reflect those changes;” rather the purpose was “to determine the validity ... at its inception after its real-life impact had been tested in at least one election.”
The legislature last apportioned the state in 1972. We may admit for these purposes that in 1972 the plan was not drawn to deliberately discriminate and did not at that time operate to cancel out petitioners’ voting strength. But this is of little importance. Today — (that’s the question) are these voters being represented in accordance with the Constitutions of the State of Florida and the United States of America?
These petitioners ask only for appointment of a commissioner to take testimony and other evidence in order to determine whether the voting strength of an identifiable element of the voting population in House District 109-114 has been diluted as a result of multi-member districting. We should grant this petition because Art. Ill, § 16(c), Fla.Const., specifically provides for judicial review of legislative apportionment by this Court, and because we expressly retained jurisdiction for just this purpose— to consider the real-life impact of the 1972 apportionment plan. In re Apportionment Law Appearing as Senate Joint Resolution Number 1305, 1972 Regular Session, 263 So.2d 797 (Fla.1972).
*24 Shortly after holding that the apportionment plan of 1972 was constitutional on its face this Court decided In re Apportionment Law, 279 So.2d 14 (Fla.1973) a suit alleging that the apportionment law was unconstitutional, in its practical effect, on the theory that it deprived citizens of Lee County of meaningful senatorial representation. In that original action in this Court, we addressed the issue of jurisdiction and, at page 15, stated:
“In upholding the apportionment law, we said that the scheme, in a particular case, might operate to undermine the voting strength of a racial or political group. We added, ‘when this is demonstrated we will consider whether the apportionment plan still passes constitutional muster.’ In re Apportionment Law, Senate Joint Resolution Number 1305, 263 So.2d 797, p. 808.” (emphasis added)
Later in another original action entitled In re Apportionment, 281 So.2d 484 (Fla.1973) the court again spoke of its jurisdiction in these terms:
“We have already determined that the apportionment law is valid on its face (In re Apportionment Law, Senate Joint Resolution Number 1305, 263 So.2d 797 (Fla. 1972), and have retained jurisdiction to hear particular complaints about the application of the apportionment plan pursuant to Fla.Const., art. 3, (16)(c) F.S.A., and Fla.Stat. 86.061, F.S.A. We have sole jurisdiction to hear the present complaint.” (at p. 484) (emphasis added)
The majority today abrogates that jurisdiction and transfers the cause to the circuit court. No authority is cited for such a transfer. While transfer to the circuit courts may be a convenient way to handle apportionment cases all the authority of this Court indicates original, exclusive jurisdiction here.
Meaningful representation is the foundation of a democratic society. If an apportionment scheme operates to minimize or eliminate meaningful representation for some segment of the voting population, at its inception or in application, the plan is unconstitutional. The majority today rules that the discrimination must be present from the very inception of the legislative plan. At inception the plan can only be attacked facially. On the other hand, the majority admits that at least one election should be held to test its constitutionality in its real-life impact. If this be true, and if the plan may be held unconstitutional, as applied, at the first election following its adoption, why not at the second or third elections. Are constitutional rights to be protected only each ten years? Or, eight years? Dicennial review is wholly inadequate to protect such a basic right as equal representation.
ADKINS, J., concurs.