389 So.2d 978 (1980)
Morris W. MILTON, Charles Shorter, S. Curtis Kiser, Lorraine Quinn, and Pamela A. Meacomes, Petitioners,
v.
Bruce M. SMATHERS, As Secretary of State of Florida; and Charles J. Kaniss, As Supervisor of Elections of Pinellas County, Florida, Respondents.
No. 51041.
Supreme Court of Florida.
October 23, 1980.
*979 Peter M. Dunbar of Dunbar, Dunbar & Roman, Dunedin, S. Curtis Kiser of Kurland, Johnson & Kiser, Clearwater, and Morris W. Milton of Williams & Milton, St. Petersburg, for petitioners.
Jim Smith, Atty. Gen., and Joseph A. Linnehan, Asst. Atty. Gen., Tallahassee, and Thomas C. Schiereck, Asst. County Atty., for Pinellas County, Clearwater, for respondents.
Dennis J. Wall, Gainesville, for amicus curiae.
John E. Mathews, Jr. and Jack W. Shaw, Jr. of Mathews, Osborne, Ehrlick, McNatt, Gobelman & Cobb, Jacksonville, for Donald Tucker and Lew Brantley, intervenors.
ALDERMAN, Justice.
Pursuant to the procedures established by In re Apportionment Law, Senate Joint Resolution 1305, 263 So.2d 797, 822 (Fla. 1972), in an original proceeding, petitioners, Morris Milton and Charles Shorter, challenged the constitutional validity of Senate Joint Resolution 1305 as it applied to them in multimember House Districts 57-61 on its effective date. We found that their petition stated sufficient allegations to come within the retained jurisdiction of this Court as set forth in In re Apportionment Law, Senate Joint Resolution 1305,[1] and we appointed Circuit Judge Victor Cawthon as our commissioner to make factual findings and recommendations. Milton v. Smathers, 351 So.2d 24 (Fla. 1979).
Commissioner Cawthon made findings of fact and concluded that the efforts of petitioners to prove the creation of the district unconstitutional were unsuccessful. He determined that the resolution at its inception did not operate so as to unconstitutionally minimize or cancel out the voting strength of the black members of the population by denying members of the black minority an opportunity equal to that of other residents of the district to participate in the political process and to elect legislators of their choice. We approve the following findings of fact and recommendations of the commissioner:[2]
In the general terms of this Court's Opinion filed herein on June 30, 1977, and of the Commissioner's procedural guidelines approved by the Court on February 8, 1978, the Petitioners are not entitled to relief unless Senate Joint Resolution 2305, 1972 Regular Session is determined to have operated at its inception to unconstitutionally minimize or cancel out the voting strength of black members of the voting population of Florida House Districts 57-61 by denying to the members of the black minority in that district an opportunity equal to that of other residents in the district to participate in the political processes and to elect legislators of their choice.
This determination depends somewhat on the answers found to the following questions:
1. Are the blacks in this district an identifiable class for Fourteenth Amendment purposes?
2. Is a majority vote in the primary election required to nomination?
3. Must candidates qualify for a certain "place" on the ticket?
4. Is cumulative voting prohibited?
5. Are candidates allowed to reside anywhere in the district?
6. Have members of this class historically suffered from discrimination in this geographic area as evidenced by:
(a) Segregated schools,
(b) Poll tax,
(c) Literacy tests,
(d) Cultural and language barriers,
(e) White primaries.
7. Is some other group in control of the majority party slate?

*980 8. Are racial campaign tactics used against black candidates?
9. Is the district a large one as compared to Bexar and Dallas Counties in Texas?
10. Is there a one-party system?
11. Is The District multi-membered for both houses of the legislature?
12. Is a substantial portion of the House elected from this District?
13. Is the multi-member scheme rooted in racial discrimination?
14. Do blacks register as large a percentage of their eligible voters as do whites?
15. Are the representatives who are elected responsive to the interests of the blacks?
16. Are the candidates of either party in need of the black vote?
No analysis of the evidence is required to determine that questions 1-5 must be answered affirmatively and these answers are favorable to the position of the petitioners.
Likewise, although poll taxes, white primaries and literacy tests have not been a part of the Florida electoral process for at least forty years, there is no question that blacks have been, in much more recent history, discriminated against.
On the other hand, it is equally as obvious that questions 7-13 must be answered in the negative and that these answers would be unfavorable to the position of the petitioners.[1]
[1] The Commissioner accepted Dr. Manning J. Dauer's testimony as conclusive evidence from the individual who was the most influential in Florida reapportionment from 1955 to the present that the multimember District in Florida was not "rooted in racial discrimination."
Although black registration in The District was mentioned in the testimony of Frederick James Hicks, Carolyn C. Murphy and Frank Pierce, all witnesses for the petitioners, and although Charles D. Shorter, Jr., another witness for the petitioners, testified the area in The District most heavily populated by blacks "probably has the lowest voter registration," none of this evidence nor all of it approaches what a fact finder would need to determine what percentage of the blacks in The District eligible to vote-as distinguished from population-registered and how this percentage would compare with the percentage of non-blacks in The District eligible to vote who registered.
For this reason no answer can be given to question # 14.
The petitioners' witnesses generally testified that the representatives from The District were not responsive to the interests of the black minority but three of those representatives who were called by the respondents testified that they were. This apparent conflict in testimony was not real.
The petitioners' witnesses seemed to be referring to a lack of responsiveness on the part of the representatives to the collective problems of the black community such as housing, health care, welfare, employment and education as evidenced by their failure to sponsor or initiate legislation designed to benefit the black minority in these areas. The representatives themselves were testifying as to their practice of treating black and white constituents the same when asked by members of either race for help, and of their efforts to determine in what ways they could help.
With a few exceptions, witnesses for both sides testified that the leaders of the black community had not asked the representatives from The District to support, oppose, or introduce any specific legislation.
It is apparent from the testimony and from the nature of multimember districts like this one in which a minority of blacks and a majority of whites both live, that its representatives are not as responsive to the interests of blacks as they would be if they represented a constituency which was largely or completely black.
It would certainly seem from the record that the Democratic candidates in The District need the black vote to win. Although the majority of blacks in The District register and presumably vote *981 democratic, the party lost all five seats in the general elections in 1972 and 1974. In 1976 the only Democrat to win was Don Poindexter, and his success was partially due to the strong showing which he made in black precincts.
Since some of the answers to the sixteen questions initially posed are favorable to the position of the petitioners and some are unfavorable, and since no appellate court has to date favored us with any indication as to what weight should be given each criteria or what number of favorable answers would be required for the petitioners' case to achieve a passing grade, it is the Commissioner's recommendation that the Court test the constitutionality of the creation of The District by the extent of the opportunity blacks have to participate in the electoral processes.
From the record black Democrats have an opportunity equal to that of white Democrats to participate in the political processes in The District. They participated in Democratic party functions on a local and state level, had input in the formulation of the party's platform, formed a caucus which endorsed candidates in The District, some of whom were successful, served on the Democratic Executive Committee and were nominated as candidates in the party primaries without opposition.
From the foregoing, it would appear that the petitioners' efforts to prove the creation of The District to have been unconstitutional were unsuccessful.
An examination of the record reveals that the reason black candidates have not been elected is not because of racial discrimination but rather because they run as Democratic candidates in a Republican area of the state.
Our decision to approve the commissioner's findings and recommendation and our holding that multimember districts 57-61 do not violate the fourteenth or fifteenth amendments to the United States Constitution are buttressed by the recent pronouncements of the Supreme Court of the United States in City of Mobile, Alabama v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). The Supreme Court held that Mobile's at-large electoral system of electing its governing commissioners did not violate the fourteenth or fifteenth amendment rights of the city's black minority population. The commissioners elected at large jointly exercised all legislative, executive, and administrative power in the city. A class action was brought on behalf of the black citizens on the basis that the at-large election process diluted the voting strength of the blacks. Explaining that racially discriminatory motivation is a necessary ingredient of a fifteenth amendment violation, the Court held that this amendment "prohibits only purposefully discriminatory denial or abridgement by government of the freedom to vote `on account of race, color, or previous condition of servitude.'" 446 U.S. at 60, 100 S.Ct. at 1497 (emphasis added). The Court emphasized that the fifteenth amendment does not entail the right to have black candidates elected. Finding no purposeful discrimination and that the blacks in Mobile registered and voted without hindrance, the Court concluded that there was no fifteenth amendment violation.
Evaluating the fourteenth amendment equal protection challenge to the Mobile election scheme, the Supreme Court initially reiterated that multimember districts are not unconstitutional per se but that they could violate the fourteenth amendment if their purpose were invidiously to minimize or cancel out the voting potential of racial or ethnic minorities. This invidious intent or purpose of racial discrimination, the Supreme Court explained, cannot be proved by merely showing that the group discriminated against has not elected representatives in proportion to its numbers. Disproportionate effects alone will not establish a claim of unconstitutional racial vote dilution. Rather, "[a] plaintiff must prove that the disputed plan was `conceived or operated as a purposeful device to further racial discrimination.' [Whitcomb v. Chavis, 403 U.S. 124, 149 [91 S.Ct. 1858, 1872, 29 L.Ed.2d 363] (1971)]." 446 U.S. at 66, *982 100 S.Ct. at 1499. Proof of a discriminatory effect is not sufficient. Reversing the lower courts on the basis that no discriminatory purpose had been proved, the Supreme Court stated that the district court had based its determination of unconstitutionality primarily on the fact that no black had ever been elected to the city commission and the fact that the city officials had not been as responsive to the interests of blacks as to those of white persons but that the lower court had also seemingly inconsistently found that there were no inhibitions against blacks becoming candidates or registering to vote. The Supreme Court further said:
But past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful. The ultimate question remains whether a discriminatory intent has been proved in a given case. More distant instances of official discrimination in other cases are of limited help in resolving that question.
Finally, the District Court and the Court of Appeals pointed to the mechanics of the at-large electoral system itself as proof that the votes of Negroes were being invidiously canceled out. But those features of that electoral system, such as the majority vote requirement, tend naturally to disadvantage any voting minority, as we noted in White v. Regester, supra. They are far from proof that the at-large electoral scheme represents purposeful discrimination against Negro voters.
446 U.S. at 74, 100 S.Ct. at 1503. In refutation of Justice Marshall's dissenting opinion, the Supreme Court held:
The Equal Protection Clause of the Fourteenth Amendment does not require proportional representation as an imperative of political organization. The entitlement that the dissenting opinion assumes to exist simply is not to be found in the Constitution of the United States.
.....
It is true, as the dissenting opinion states, that the Equal Protection Clause confers a substantive right to participate in elections on an equal basis with other qualified voters. See Dunn v. Blumstein, 405 U.S. 330, 336 [92 S.Ct. 995, 999, 31 L.Ed.2d 274]; Reynolds v. Sims, 377 U.S. 533, 576 [, 84 S.Ct. 1362, 1389, 12 L.Ed.2d 506]. But this right to equal participation in the electoral process does not protect any "political group," however defined, from electoral defeat.
.....
The fact is that the Court has sternly set its face against the claim, however phrased, that the Constitution somehow guarantees proportional representation. In Whitcomb v. Chavis, supra, the trial court had found that a multimember state legislative district had invidiously deprived Negroes and poor persons of rights guaranteed them by the Constitution, notwithstanding the absence of any evidence whatever of discrimination against them. Reversing the trial court, this Court said:
"The District Court's holding, although on the facts of this case limited to guaranteeing one racial group representation, is not easily contained. It is expressive of the more general proposition that any group with distinctive interests must be represented in legislative halls if it is numerous enough to command at least one seat and represents a majority living in an area sufficiently compact to constitute a single-member district. This approach would make it difficult to reject claims of Democrats, Republicans, or members of any political organization in Marion County who live in what would be safe districts in a single-member district but who in one year or another, or year after year, are submerged in a one-sided multi-member district vote. There are also union oriented workers, the university community, religious or ethnic groups occupying identifiable areas of our heterogeneous cities and urban areas. Indeed, it would be difficult for a great many, if not most, multi-member districts to survive analysis under the District Court's view unless combined *983 with some voting arrangement such as proportional representation or cumulative voting aimed at providing representation for minority parties or interests. At the very least, affirmance of the District Court would spawn endless litigation concerning the multi-member district systems now widely employed in this country." Whitcomb v. Chavis, supra, [403 U.S.] at 156-157 [91 S.Ct. at 1875-1876] (footnotes omitted).
446 U.S. at 75-80, 100 S.Ct. at 1503-1507. 1507.
In the present case, petitioners have failed to allege or prove that the disputed election plan was conceived or operated as a purposeful device to further racial discrimination.
Accordingly, the relief requested by petitioners is denied.
It is so ordered.
BOYD, OVERTON and McDONALD, JJ., concur.
OVERTON, J., concurs specially with an opinion.
SUNDBERG, C.J., dissents in part with an opinion, with which ENGLAND, J., concurs.
ADKINS, J., dissents with an opinion.
OVERTON, Justice, concurring specially.
I agree with the majority opinion in that it expresses the law as set forth most recently by the United States Supreme Court in City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Although I personally favor single-member districts in our representative political system and so voted as a member of the Florida Constitution Revision Commission, I believe I am bound by this most recent Supreme Court ruling. There clearly is no fourteenth amendment constitutional requirement to have single-member districts under Bolden, absent a finding of purposeful discrimination. There was no such purposeful discrimination in the establishment of the multimember district in issue in this case. Further, if this multimember district is unconstitutional, then, in my view, all legislative multimember districts should be declared unconstitutional.
Whether the standards for fourteenth amendment voting district relief also apply to requests for identical relief under the fifteenth amendment is an issue that was not properly presented in this cause. The plurality decision in Bolden clearly implies that the same standards are applicable. The petitioner in the instant case submitted this cause as a fourteenth amendment violation and did not contend there should be different standards for fourteenth and fifteenth amendment claims.
SUNDBERG, Chief Justice, dissenting in part.
In spite of its inscrutable nature, one pattern does emerge from City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which evinces a lack of consensus as to whether a discriminatory purpose must be demonstrated in a proper fifteenth amendment case.[1] I believe because of the fundamental nature and specific scope of the fifteenth amendment that the burden of proof in these cases should be allocated more in favor of the complaining party than in those cases predicated principally upon the fourteenth amendment. Although I do not go so far as to agree that every "showing of discriminatory impact" on a racial group's voting rights is sufficient for relief under the fifteenth amendment,[2] I also do not believe that this necessarily implies the opposite, viz., a requirement of showing a discriminatory purpose for fifteenth amendment relief.
*984 The standard I would adopt, as an alternative to those antimonies, is based upon the implications of such cases as Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), and White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). These cases suggest that a party can make out its cause of action by showing a significant adverse impact on a racial group's right to vote. The onus would then be placed onto the state to rationalize this adverse impact on a racial group by the showing of some neutral justification. See Gomillion, 364 U.S. at 342, 81 S.Ct. at 127.
Because, however, petitioners did not raise the fifteenth amendment arguments in the record before us, I would refer the case back to the commissioner for taking additional testimony and considering additional arguments for the purpose of making findings based upon these fifteenth amendment arguments, since a viable claim founded on the fifteenth amendment does appear possible.
ENGLAND, J., concurs.
ADKINS, Justice, dissenting.
I dissent.
In City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), the United States Supreme Court held that the city of Mobile did not violate the Constitution by maintaining an at-large system of electing city officials. Since 1911 the city of Mobile had been governed by a city commission consisting of three members elected by the voters of the city at-large. Bolden and others brought class action on behalf of all Negro citizens of Mobile alleging that the practice of electing the commissioners at-large unfairly diluted the voting strength of the Negroes in violation of section 2 of the Voting Rights Act of 1965, as well as the Fourteenth Amendment and Fifteenth Amendments to the United States Constitution. The District Court found that the constitutional rights of Bolden had been violated and entered a judgment in favor of plaintiffs, ordering that the city commission be disestablished and replaced by a municipal government consisting of a mayor and the city council with members elected in single-member districts. Bolden v. City of Mobile, 423 F. Supp. 384 (S.D.Ala. 1976). The Court of Appeals affirmed the judgment in its entirety, Bolden v. City of Mobile, 571 F.2d 238 (5th Cir.1978), agreeing that Mobile's at-large elections operated to discriminate against Negroes in violation of the Fourteenth and Fifteenth Amendments and finding that the remedy formulated by the district court was appropriate. A majority of the Supreme Court agreed to reverse the Court of Appeals, but for various reasons.
By its decision the Supreme Court did not give a stamp of approval for all at-large elections in cities. On the same day the Court rendered its decision in City of Rome v. United States, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980). In 1966 the city of Rome changed to the majority vote, runoff election scheme, rather than the previous scheme which provided for a plurality vote for each of the members of the city commission. The attorney general had designated Georgia as a jurisdiction under the Voting Rights Act of 1965. 42 U.S.C. § 1973 et seq. (1976). The district court found that the disapproved electoral changes had not been made for any discriminatory purposes, but did have a discriminatory effect. The city argued that the Voting Rights Act may not be read as prohibiting voting practices that have only a discriminatory effect. Under the Voting Rights Act the city had the burden of proving the absence of discriminatory purpose and effect. The Supreme Court held that the lower court did not clearly err in finding that the city had failed to prove that the 1966 electoral changes would not dilute the effectiveness of the Negro vote in Rome. The conclusion of the district court was based on the presence of three vote-dilutive factors: "the at large electoral system, the residency requirement for officeholders, and the high degree of racial bloc voting." 446 U.S. at 187, 100 S.Ct. at 1566. Justice Stewart, the author of the Mobile opinion, joined Justice Rehnquist in dissenting. Justice Powell also dissented.
*985 In Mobile, Justice Stewart, joined by Chief Justice Burger, Justice Powell, and Justice Rehnquist held that Mobile's at-large electoral system did not violate the rights of the city's voters in contravention of the Fifteenth Amendment. They held that racially discriminatory motivation was a necessary ingredient of a Fifteenth Amendment violation. They also held that the electoral system did not violate the rights of the Negro voters and contravene the Fourteenth Amendment and there could be a violation of the equal protection clause only if there was a purposeful discrimination. In City of Rome, Justice Stewart in his dissent recognized that four members of the Court in Mobile held that purposeful discrimination would be a prerequisite to establishing a constitutional violation in a case alleging vote dilution under the Fourteenth and Fifteenth Amendments. He commented that "a majority of the court might adopt this view". City of Rome, 446 U.S. at 210 n. 3, 100 S.Ct. at 1579 n. 3. Rehnquist and Stewart, JJ., dissenting.
In his plurality (not majority) opinion, Justice Stewart pointed out the criteria upon which the district court and court of appeals relied to prove an unconstitutionally discriminatory purpose.
First the trial court found it significant that no Negro had been elected; second, the trial court relied in part on its finding that the persons who were elected to the commission discriminated against Negroes in municipal employment and in dispensing public services; third, the trial court supported its conclusion by drawing upon the substantial history of official racial discrimination in Alabama; and, fourth, the trial court pointed to the mechanics of the at large electoral system itself as proof that the votes of Negroes were being invidiously cancelled out.
The plurality opinion says that this proof was insufficient to show purposeful discrimination against Negro voters. In a footnote, Justice Stewart refers to the fact that the municipal government of Mobile is established by the legislature and there was evidence that several proposals that would have altered the form of municipal government had been defeated in the state legislature. City of Mobile, 446 U.S. at 74 n. 21, 100 S.Ct. at 1504 n. 21. One proposal which was defeated would have permitted Mobile to govern itself through a mayor and city council with members elected from individual districts within the city.
Justice Stevens, in concurring in the judgment, did not believe that it is appropriate to focus on the subjective intent of the decision makers. Justice Stevens said:
In my view, the proper standard is suggested by three characteristics of the gerrymander condemned in Gomillion: [Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960)]. (1) the 28-sided configuration was, in the Court's word, "uncouth," that is to say, it was manifestly not the product of a routine or a traditional political decision; (2) it had a significant adverse impact on a minority group; and (3) it was unsupported by any neutral justification and thus was either totally irrational or entirely motivated by a desire to curtail the political strength of the minority. These characteristics suggest that a proper test should focus on the objective effects of the political decision rather than the subjective motivation of the decisionmaker. See United States v. O'Brien, 391 U.S. 367, 384 [, 88 S.Ct. 1673, 1683, 20 L.Ed.2d 672] [Footnote omitted]. In this case, if the commission form of government in Mobile were extraordinary, or if it were nothing more than a vestige of history, with no greater justification than the grotesque figure in Gomillion, it would surely violate the Constitution. That conclusion would follow simply from its adverse impact on black voters plus the absence of any legitimate justification for the system, without reference to the subjective intent of the political body that has refused to alter it.
446 U.S. at 90, 100 S.Ct. at 1512, Stevens, J., concurring.
Justice Blackmun concurred in the Court's judgment of reversal because he believed that the relief afforded by the *986 district court was not commensurate with the sound exercise of judicial discretion. He could see no reason for the district court to have separated legislative and executive power in the city of Mobile by creating the office of Mayor and would reverse so that the District Court could consider alternative plans. However, Justice Blackmun agreed with Justice White that, in this case, "the findings of the District Court amply support an inference of purposeful discrimination." City of Mobile, 446 U.S. at 80, 100 S.Ct. at 1507, Blackmun, J., concurring.
Justice Brennan and Justice Marshall agreed that the proof of discriminary impact was sufficient. Even accepting the plurality's premise that discriminatory purpose must be shown, they agreed with Justice Blackmun and Justice White that Bolden had clearly met that burden. In other words, four justices held that the proof was sufficient to show an invidious motivation, while four other justices held that the proof was insufficient. The ninth justice, Stevens, while concurring in the result for other reasons, said:
I do not believe otherwise legitimate political choices can be invalidated simply because an irrational or invidious purpose played some part in the decisionmaking process... . I believe we must accept the choice to retain Mobile's commission form of government as constitutionally permissible even though that choice may well be the product of mixed motivation, some of which is invidious.
446 U.S. at 92, 100 S.Ct. at 1513.
Even if we construe the decision of the United States Supreme Court as holding that an invidious purpose must be adduced to support a claim of unconstitutionality under the Fourteenth or Fifteenth Amendment, the evidence as outlined in Justice Stewart's plurality opinion is sufficient to show this invidious purpose.
It follows that the evidence in the case sub judice is sufficient to show a discriminatory purpose under the guideline as established by a majority of the justices of the United States Supreme Court in City of Mobile.
Petitioners Milton and Shorter are black registered voters in House Districts 57-61. In 1970 the total population of Pinellas County was 722,329 of which 42,774 were black persons. In districts 57-61 there are approximately 282,805 residents of whom approximately 33,535 are blacks according to the 1970 census. The Pinellas County legislative delegation consists of ten representatives and seven senators. Five representatives are elected in at-large elections from districts 57-61. There is one representative for every approximately 56,000 persons in districts 57-61. Approximately 12% of the population of House Districts 57-61 is black and is located in a relatively small geographical area.
No black has been elected to the legislature in Pinellas County in this century. Petitioner Shorter was nominated by the democratic party to a seat in the House of Representatives in district 61, but in the general election petitioner Shorter was defeated by the republican candidate. The returns disclose that petitioner Shorter carried nine adjacent precincts with over 75% of the vote cast and twenty-nine adjacent precincts with over 50% of the vote. Notwithstanding the solidarity of the black vote, the votes were ineffective district-wide. Petitioner Shorter received 39,369 votes and his republican opponent received 43,599 votes.
Petitioner Milton was a candidate in the first 1976 primary election for House District 61. He carried seven adjacent precincts with over 90% of the votes cast and six additional adjacent precincts with over 70% of the votes cast. The precincts which petitioner Milton carried were black precincts. In the democratic primary petitioner Milton received 9,651 votes and his opponent received 12,158 votes.
Petitioners also disclose that during the 1975 regular session of the Florida House of Representatives, the Pinellas delegation from districts 57-61 voted on 551 general bills and joint resolutions. A review of the voting records disclosed that the representatives consistently voted as a bloc. Petitioners point out that only sixty-eight votes *987 out of the total 551 were not uniform. Petitioners say that the divergent interest within districts 57-61 could not be effectively represented by such a cohesive delegation.
Evidence shows that no black has ever been elected in a partisan election in the district. The dual school system in Pinellas County was desegregated only pursuant to a court order. There is evidence of employment discrimination as well as disparagement in municipal services, income level, and living conditions.
Ten representatives are elected from Pinellas County and five of them run in this multimember district. The statewide apportionment policy followed by the legislature was to provide multimember districts for densely populated counties to guarantee effective representation and operation of government at the state level. "Multimember districts in densely populated counties of the state are based on the county's representational ratio, however no multimember district exceeds six (6) representatives; single-member districts are based on the same policy and are provided in the counties not covered above." In Re Apportionment Law, 263 So.2d 797 at 801 (Fla. 1972). Under this apportionment plan, we now have only four blacks who have been elected to the House of Representatives. This of course does not in itself invalidate the multimember districts, but it is a factor to be considered in determining whether or not multimember House Districts 57-61 were created for the purpose of diluting or abridging the vote of the blacks.
We upheld the facial constitutional validity of multi-member districts in Florida. In Re Apportionment Law, supra. In this decision we said:
We, therefore, hold that variable multi-member districts are not per see invalid under the Florida Constitution. It might well be that, designedly or otherwise, a multi-member constituency scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population. When this is demonstrated, we will consider whether the apportionment plan still passes constitutional muster.
In other words, the apportionment plan as framed may be constitutional on its face, but upon its application in a particular case the joint resolution may violate organic law. This is in accord with our holdings that a statute may be valid as applied to one state of facts, though invalid as applied to another state of facts. See 4 F.L.P., Constitutional Law, § 10, p. 253, and authorities cited.
263 So.2d at 808 (emphasis supplied). The words "designedly or otherwise" as used in the above quotation from our decision comes from Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). In this case the Supreme Court upheld the validity of a Georgia plan which divided rural areas into single-member districts, but urban areas into multimember districts, thus minimizing the effectiveness of the votes of blacks concentrated in the urban areas. There was no proof offered to support the claim that the multimember districts did in fact minimize or cancel out the voting strength of the blacks. The Court ruled that the equal protection clause did not necessarily require the formation of all single-member districts. The Court did not, however, declare that in all cases multimember districts would be constitutionally permissible. The Court, speaking through Justice Brennan, said:
[O]ur opinion is not to be understood to say that in all instances or under all circumstances such a system as Georgia has will comport with the dictates of the Equal Protection Clause. It might well be that, designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population. When this is demonstrated it will be time enough to consider whether the system still passes constitutional muster.
379 U.S. at 439, 85 S.Ct. at 501.
These words were reiterated in Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 *988 L.Ed.2d 376 (1966), as being the correct test to apply in vote dilution claims. This standard was again considered and applied in Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). One of the justices construed these words, "designedly or otherwise" as authorizing the constitutional challenge of a multimember district by showing that there was a discriminatory effect of denying equal access to the political process. See Mobile v. Bolden, supra.
In challenges based upon the Fourteenth Amendment, the plaintiff should be required to show that the plan's draftsmen intended to dilute the effectiveness of the vote of a certain racial element, but this intent may be shown by the totality of the circumstances which may include the effect of the plan.
The plurality in Mobile says that action by a state that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose. 446 U.S. at 61, 100 S.Ct. at 1497. The Mobile plurality takes the position that White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), is consistent with "the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." 446 U.S. 70, 100 S.Ct. 1501, quoting Washington v. Davis, 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.E.2d 597 (1976).
In White v. Regester, the Court affirmed a judgment of the district court invalidating the multimember districts in Dallas and Bexar Counties, Texas, and ordered those districts to be redrawn into single-member districts. The following discussion related to the evidence produced to support a contention that the voting strength of the blacks was cancelled out or minimized:
[T]he District Court first referred to the history of official racial discrimination in Texas, which at times touched the right of Negroes to register and vote and to participate in the democratic processes. 343 F. Supp. at 725. It referred also to the Texas rule requiring a majority vote as a prerequisite to nomination in a primary election and to the so-called "place" rule limiting candidacy for legislative office from a multimember district to a specified "place" on the ticket, with the result being the election of representatives from the Dallas multimember district reduced to a head-to-head contest for each position. These characteristics of the Texas electoral system, neither in themselves improper nor invidious, enhanced the opportunity for racial discrimination, the District Court thought. More fundamentally, it found that since Reconstruction days, there have been only two Negroes in the Dallas County delegation to the Texas House of Representatives and that these two were the only two Negroes ever slated by the Dallas Committee for Responsible Government (DCRG), a white-dominated organization that is in effective control of Democratic Party candidate slating in Dallas County. That organization, the District Court found, did not need the support of the Negro community to win elections in the county, and it did not therefore exhibit good-faith concern for the political and other needs and aspirations of the Negro community. The court found that as recently as 1970 the DCRG was relying upon "racial campaign tactics in white precincts to defeat candidates who had the overwhelming support of the black community." Id., at 727.
412 U.S. 766-67, 93 S.Ct. at 2339-2340. (Footnotes omitted).
From this evidence the Court concluded that the black community was effectively excluded from participation in the democratic primary selection process and was therefore generally not permitted to enter into the political process in a reliable, meaningful manner.
The Supreme Court of the United States reached the same conclusion in connection with the multimember district district in Bexar County. In its opinion the Court said:
Surveying the historic and present condition of the Bexar County Mexican-American *989 community, which is concentrated for the most part on the west side of the city of San Antonio, the [district] court observed, based upon prior cases and the record before it, that the Bexar community, along with other Mexican-Americans in Texas, had long "suffered from, and continues to suffer from, the results and effects of invidious discrimination and treatment in the fields of education, employment, economics, health, politics and others." 343 F. Supp., at 728. The bulk of the Mexican-American community in Bexar County occupied the Barrio, an area consisting of about 28 contiguous census tracts in the city of San Antonio. Over 78% of Barrio residents were Mexican-Americans, making up 29% of the county's total population. The Barrio is an area of poor housing; its residents have low income and a high rate of unemployment. The typical Mexican-American suffers a cultural and language barrier that makes his participation in community processes extremely difficult, particularly, the court thought, with respect to the political life of Bexar County. "[A] cultural incompatibility ... conjoined with the poll tax and the most restrictive voter registration procedures in the nation have operated to effectively deny Mexican-Americans access to the political processes in Texas even longer than the Blacks were formally denied access by the white primary." 343 F. Supp., at 731. The residual impact of this history reflected itself in the fact that Mexican-American voting registration remained very poor in the county and that only five Mexican-Americans since 1880 have served in the Texas Legislature from Bexar County. Of these, only two were from the Barrio area. The District Court also concluded from the evidence that the Bexar County legislative delegation in the House was insufficiently responsive to Mexican-American interests.
412 U.S. at 767-69, 93 S.Ct. at 2340-2341. (Footnotes omitted).
The Supreme Court of the United States did not hold that every racial or political group has a constitutional right to be represented in the state legislature, but did conclude that the multimember districts, as designed and operated in Dallas and Bexar Counties, invidiously excluded the blacks and Mexican-Americans from effective participation in political life, specifically in the election of representatives to the Texas House of Representatives.
A footnote of the plurality opinion in Mobile contains the following:
In Gafney [Gaffney] v. Cummings, 412 U.S. 735 [93 S.Ct. 2321, 37 L.Ed.2d 298], a case decided the same day as White v. Regester, 412 U.S. 755 [, 93 S.Ct. 2332, 37 L.Ed.2d 314], the Court interpreted both White and the earlier vote dilution cases as turning on the existence of discriminatory purpose:
"State legislative districts may be equal or substantially equal in population and still be vulnerable under the Fourteenth Amendment. A districting statute otherwise acceptable, may be invalid because it fences out a facial group so as to deprive them of their pre-existing municipal vote. Gomillion v. Lightfoot, 364 U.S. 339 [81 S.Ct. 125, 5 L.Ed.2d 110] (1960). A districting plan may create multimember districts perfectly acceptable under equal population standards, but invidiously discriminatory because they are employed "to minimize or cancel out the voting strength of racial or political elements of the voting population." Fortson v. Dorsey, 379 U.S. 433, 439 [85 S.Ct. 498, 501, 13 L.Ed.2d 401] (1965). See White v. Regester, [412 U.S.] p. 755 [93 S.Ct. p. 2334]; Whitcomb v. Chavis, 403 U.S. 124 [91 S.Ct. 1858, 29 L.Ed.2d 363] (1971); Abate v. Mundt, 403 U.S. 182 at 184, n. 2 [91 S.Ct. 1904, at 1906, 29 L.Ed.2d 399]; Burns v. Richardson, 384 U.S., at 88-89 [86 S.Ct. at 1294-1295]." Gafney [Gaffney] v. Cummings, supra [412 U.S.] at 751 [93 S.Ct. at 2330] (emphasis added).
446 U.S. at 69 n. 14, 100 S.Ct. at 1501 n. 14.
In the case sub judice, it we apply the impact or effect theory as suggested by *990 Justices Marshall, White, and Brennan, the evidence clearly shows that the multimember district plan violates the equal protection clause of the Fourteenth Amendment as well as the Fifteenth Amendment. A similar result is reached when we apply the standards as delineated by Justice Stevens, when he said that "a proper test should focus on the objective effects of the political decision rather than the subjective motivation of the decisionmaker." 446 U.S. at 90, 100 S.Ct. at 1512, Stevens, J., concurring. Justice Blackmun said that the proof in Mobile was adequate to support an inference of purposeful discrimination. 446 U.S. at 80, 100 S.Ct. at 1507, Blackmun, J., concurring. Following the reasoning of a majority of the justices of the United States Supreme Court in Mobile, the plaintiffs in the case sub judice should prevail.
If either of the Fourteenth or Fifteenth Amendments proscribe districts based on racial criteria, the crucial issue becomes one of proof. The courts must ascertain what may loosely be called the legislative intent. If we enunciate a test based solely on the de facto nature, or effect of the apportionment resolution, rather than the legislative purpose which generated its passage, the problem can appear to be delusively simple. Such an approach finds the constitutional evil in the fact that people bearing a given trait, such as race, find themselves grouped together after the passage of the apportionment resolution, rather than in the fact that the legislature has used a forbidden criterion. If the fact of racial homogeneity is regarded as the constitutional evil, the state legislature would be forced to employ racial criteria in drawing district lines so as to avoid a constitutionally impermissible, or even constitutionally suspect, grouping of members of the same race.
In Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935), and Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954), the Supreme Court determined that there was systematic exclusion of blacks from jury service through the use of a de facto "defects" test. Thus the prima facie case was held to have been established solely on the strength of a comparison between the number of minority group members residing within a given community and the number of members of that group who had served on its juries. Such a showing established a prima facie case of systematic jury exclusion, and required the state either to rebut plaintiff's evidence of the infrequency of selection of minority group members, or to suggest an alternative explanation of these facts. By showing that no members of the minority group had served on a jury, the plaintiffs created a clear inference of systematic exclusion.
In racial gerrymander challenges to apportionment, however, a showing even of 100% racial homogeneity in a challenged district still leaves the logical possibility that the situation may be explained on many other permissible bases. It necessarily follows that the legislative intent cannot be determined by a test based solely on the de facto nature, or effect of the apportionment resolution.
On the other hand, an inquiry into whether the legislature purposefully drew district lines on a racial basis need not be an exercise in metaphysics or group psychoanalysis. Requiring a plaintiff to disprove all other permissible bases for apportionment seems to impose on him the impossible task of rebutting all phantom bases on which the apportionment resolution might have been drawn. At some point the burden of introducing evidence to substantiate the claim of other permissible bases of the challenged apportionment must shift to the state. This point should be reached when the plaintiffs have established that race is the more likely basis than the more commonly known and expected bases of districting.
The commissioner in the case sub judice found that the blacks in the district were an identifiable class for Fourteenth or Fifteenth Amendment purposes; that candidates were allowed to reside anywhere in the district; that a majority vote in the primary election was required for nomination; that candidates qualify for a certain "place" on the ticket; and cumulative voting was prohibited.
*991 Fair representation of voters in a legislative body requires, not only substantial equality of population within each district, but also the avoidance of district lines that weight the power of one race more heavily than another. The record clearly shows that the effect of the gerrymander in this case is to dilute the vote of the blacks. The evidence is sufficient to prove a prima facie case that the apportionment plan as adopted by the legislature was racially motivated insofar as multimember districts 57-61 are concerned.
The fact that we must prevent racial gerrymandering does not mean that we must prevent gerrymandering of any special-interest group, whether it be social, economic, or ideological. The Fifteenth Amendment of the Constitution says the right of citizens to vote should not be "abridged" on account of "race, color, or previous condition of servitude." The blacks may be all Democrats or all Republicans, but if their identity is washed out of the system by the apportionment plan, the plan has a constitutional defect if it appears that it was adopted for that purpose.
Petitioners were not required to show the inner workings of the minds of the members of the legislature at the time of the adoption of the apportionment plan. The fact that the apportionment plan has the effect of diluting the vote of the blacks does not, in itself, constitute sufficient evidence to show a prima facie case. Considering all facts and circumstances as they exist, and did exist, in Pinellas County, it is my opinion that the multimember districts 57-61 abridge the right of the blacks to participate in government and to vote.
I would not hold that every racial or political group has a constitutional right to be represented in the state legislature. I do conclude that the multi-member districts 57-61 as designated and operated in Pinellas County invidiously excluded blacks from effective participation in political life. The multimember district violates the Fourteenth and Fifteenth Amendments of the United States Constitution, and should be invalidated.
NOTES
[1] In In re Apportionment Law, Senate Joint Resolution 1305, we held that variable multimember districts are not per se invalid, but we went on to explain that a multimember district, under the facts of a particular case, may operate to minimize or cancel out the voting strength of racial or political elements of the voting population.
[2] References to page numbers of the transcript contained in the findings have been omitted.
[1] The plurality concedes that this issue concerning the necessity of showing purposeful discrimination in a fifteenth amendment setting has never been directly addressed by the Supreme Court. City of Mobile v. Bolden, 446 U.S. 55, 61, 100 S.Ct. 1490, 1497, 64 L.Ed.2d 47 (1980).
[2] Id. at 103, 100 S.Ct. at 1518 (dissenting opinion by Marshall, J.).